**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 15-cv-00355-CMA-MEH

ATLAS BIOLOGICALS, INC.,

      Plaintiff,

v.

THOMAS JAMES KUTRUBES, an individual,
PEAK SERUM, INC., a Colorado corporation, and
PEAK SERUM, LLC., a dissolved Colorado limited liability company,

      Defendant(s).

---

## ORDER GRANTING PLAINTIFF'S *EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER

---

      This matter is before the Court on Atlas Biological Inc.'s ("Atlas'") Ex Parte Motion for a Temporary Restraining Order and Preliminary Injunction.  (Doc. # 5.)  For the following reasons, the Court grants the Motion.

## I.  <u>BACKGROUND</u>

### A.  PROCEDURAL HISTORY

      This case concerns whether a former employee of Atlas, Thomas Kutrubes, engaged in trademark infringement, misappropriation of trade secrets, and breached his fiduciary duties. (Doc. # 1.)

      Atlas specializes in the production of bovine serum-based products[1] that are used for cell culture and research.  (*Id.* at ¶ 2.)  Fetal Bovine Serum (FBS) is a blood serum product

---

[1] Bovine serum is a product derived from cow blood; the serum is what remains after red blood cells have been separated from the blood.

manufactured from blood drawn from a bovine fetus; there is a high demand for FBS for research purposes, and it can be expensive (the price also fluctuates with changes in the market for beef products).  (*Id.* at ¶ 4.)  Atlas produces an FBS product under the registered mark of "EquaFETAL," which is superior to other products in its collection, manufacture and quality control, and, unlike "pure" FBS, is traceable, has greater consistency and lower and more stable pricing.  (*Id.* at ¶ 5.)[2]  (*Id.*)  The only individuals who have complete knowledge regarding the formulation and methods of production of EquaFETAL, besides the manufacturers who contractually agree to keep production methods confidential, are Michelle Cheever, Atlas' Director of Qualify Assurance, and Rick Paniccia, Atlas' President.  (*Id.* at ¶ 6.)   Atlas estimates that it spent at least $500,000 in developing EquaFETAL.  (*Id.* at ¶ 5.)

Kutrubes began working for Atlas as an intern in 2004; in 2006, he was hired as a sales representative, and signed a confidentiality agreement specifically related to the EquaFETAL product.  (Doc. ## 10-19, 11-7.)  In January of 2010, he became an Atlas shareholder, acquiring 5% of the common stock.  (Doc. # 11-7.)  On November 9, 2012, he was promoted to "National Sales Manager," whereby he was responsible for making sales contacts with new and existing major customers, maintaining sales records, doing business-to-business marketing, and analyzing sales volume and projections. (Doc. # 1-2.)  On January 1, 2013, he was awarded 1% in additional common stock of Atlas.  (Doc. # 11-7.)

In accepting his promotion in 2012, Kutrubes signed a "Job Description" indicating that he understood and agreed to adhere to company policies and procedures.  (Doc. # 1-2.)  These policies included a confidentiality and non-disclosure provision, which provided that:

> In the course of employment, employees will be exposed to company confidential information.  Confidential information is defined as confidential and proprietary information of the company to which the general public does not have access.

---

[2] Atlas also produces related FBS products which are sold under the trade names of EquaFETAL, Fetal+Plus, Fetal Reserve, Fetal Choice and Fetal Select.

> This will include customer lists and accounts, systems, procedures, policies, strategies, research, business plans, financial data, price lists, formulas, techniques, technology, confidential reports, computer software, contract forms, files and all other information, knowledge, or data of any kind or nature relating to the products, services, or business of the company. Confidential and proprietary information also includes work product of the employee during his or her employment with the company including emails, reports, memorandums, research and other similar documentation.
> All information disclosed by Atlas Biologicals that is considered Confidential and/or Proprietary information, or is thereby created by Employee during the fulfillment of his/her duties and functions on behalf of Atlas, shall be considered to be Confidential and/or Proprietary in nature. Any disclosure of such information is prohibited without the prior written authorization and approval from Atlas Biologicals.

(Doc. # 10-20.)

Unbeknownst to Atlas, in the fall of 2014, Kutrubes had allegedly begun both to misappropriate Atlas' trade secrets and proprietary information, and to solicit Atlas' customers. Specifically, on October 31, 2014, Kutrubes registered "Peak Serum, LLC" with the Colorado Secretary of State; on December 9, 2014, this company was dissolved, and he registered Peak Serum, Inc. (Doc. # 11-7.) Ultimately Atlas discovered that Kutrubes had drafted an extensive business plan for Peak Serum Inc., including an intent to provide protocols, standard operating procedures, and quality control and assurance procedures and guidance to contract manufacturers. (Docs. ## 5-2 at ¶ 10; 10-2 at 2, 8.) The business plan explicitly stated that "prices will be more competitive and direct competition would be from Atlas to a certain extent due to SereaTech [sic] sourcing." (Doc. # 10-2 at 6.)

Beginning on November 3, 2014, Kutrubes surreptitiously emailed a large volume of Atlas' confidential, proprietary, and trade secret documents to his personal email address. These documents included customer lists from Atlas' customer database,[3] supplier agreements

---

[3] This customer database, which has been compiled over the past 14 years, includes the following information: customer name, contact name, phone number, mobile number, fax number, address, website and email. The database also contains sales information entered by Atlas employees on a "real-time" basis, including details of communications with customers,

and surveys, the Atlas quality control manual, Atlas' organizational chart, Atlas' contract manufacturing statement, product analytical information, product certifications and registrations from the FDA and the European Directorate of the Quality of Medicines and health care, as well as forms of non-disclosure agreements, product brochures, and software login information. (Doc. ## 5-2 at ¶ 3; 7-7 to 7-13.)  Also beginning in November of 2014, Kutrubes began emailing Atlas' existing and prospective customers, advising at least sixteen of them that he was starting a new business and soliciting sales.  (Doc. ## 5-2 at ¶ 4; 7-14 to 7-27; 8-1 to 8-21; 9-1 to 9-14).  In some cases, Kutrubes stated, falsely, that Atlas and Peak Serum were "sister companies," and used Atlas' trademarks and trade names, including EquaFETAL, FETAL+PLUS, ATLAS and ATLAS BIOLOGICALS.  (*Id.*)  He also stated, falsely, that Atlas was no longer conducting international business and that Peak Serum would be responsible for Atlas' international business going forward.  (*Id.*; Doc. # 5-1 at ¶ 8.)

Kutrubes also made efforts to solicit business from Atlas' suppliers and business partners, including SeraTec, Central Biomedia, and Rocky Mountain Biologicals.  (Doc. ## 5-2 at ¶¶ 10-11; 10-12 to 10-17.)  Further, he sought proprietary information from one of Atlas' contract manufacturers, Central Biomedia, regarding Atlas' proprietary blended serum products. (Doc. # 10-18.)  Additionally, he approached Rocky Mountain Biologicals, another one of Atlas' contract manufacturers, to obtain contract manufacturing services and to obtain raw FBS.  (Doc. #5-2 at ¶ 14; 10-5 through 10-9.)

On December 16, 2014, Kuturbes tendered his letter of resignation to the Atlas Board of Directors, stating that he was resigning from his position as an employee and Director and requesting a buyout of his ownership shares.  (Doc. # 11-6.)   At this time, Atlas was unaware of

---

sales leads, past sales information, and service tasks.  (Doc. ## 5-2 at ¶ 6; 5-1 at ¶ 18.)  The database is password protected and Atlas contends that the database is "invaluable" to its business and was very costly to create "in terms of the time [it] expended creating it, and the cost of the employees who entered data into the system over the years."  (Doc. # 5-1 at ¶ 18.)

Kutrubes' other competitive business dealings.  (Doc. # 5-1 at ¶ 15.)  Shortly after Kutrubes departed, however, Atlas discovered that a large amount of data had been deleted from his computer; it also discovered the large volume of internal and confidential documents he had sent himself, the emails he had sent to Atlas' customers and suppliers and business partners, and that he had downloaded lists from Atlas' proprietary customer database.  Consequently, Atlas informed him that it was refusing his resignation and terminating him for cause.  (Doc. # 11-7.)

In late January of 2015, Atlas discovered that Kutrubes and Peak Serum had changed the company name on Atlas' "Google-plus" account to "Peak Serum, Inc."  As a result, a Google search for "Atlas Biologicals" yielded a large advertisement for Peak Serum, Inc., including a large number of positive reviews for the EquaFETAL product and references to the ATLAS and ATLAS BIOLOGICALS trade names.  (Doc. # 4-3 at ¶ 11-12).  Atlas learned that the email address associated with the account had been changed to Kutrubes' personal Gmail address at some point, but would not reveal further details without a subpoena.  (*Id.* at ¶ 12.)

Plaintiff believes that Kutrubes and Peak Serum have continued to utilize Atlas' trade secrets, including its customer lists, to solicit business for Peak Serum.  (Doc. # 5-2 at ¶ 14.)  Specifically, Atlas has received calls from at least nine customers who expressed confusion or discomfort after being contacted by Kutrubes on behalf of Peak Serum.  (*Id.* at ¶ 17.)

## B.  TEMPORARY RESTRAINING ORDER

In its Motion for a Temporary Restraining Order, Plaintiff seeks an order to enjoin Defendants from:

a.  Using the marks EquaFETAL, FETAL+PLUS, ATLAS, or ATLAS
    BIOLOGICALS in connection with Defendants' goods or services;

b.  Using any trademark, trade dress, service mark, name, logo, design or source designation of any kind on or in connection with Defendant's goods or services that is a copy, reproduction, colorable imitation, or simulation of, or confusingly similar to the trademarks, trade dress, service marks, names or logos of Atlas Biologicals, Inc.

c.  Using any trademark, trade dress, service mark, logo, design or source designation of any kind on or in connection with Defendant's goods or services that is likely to cause confusion, mistake, deception, or public misunderstanding that such goods or services are produced or provided by Atlas Biologicals, Inc., are sponsored or authorized by Atlas Biologicals, Inc., or are in any way connected with, controlled by, or related to Atlas Biologicals, Inc.;

d.  Using and further disclosing the proprietary information and trade secrets of Atlas Biologicals to produce bovine or equine serum based products, including EquaFETAL or blended or proprietary products based on Atlas' proprietary information and trade secrets;

e.  Producing products containing EquaFETAL or EquaFETAL in combination with other products;

f.  Contacting any customer or prospective customer in Atlas Biologicals, Inc.'s customer list or database; and

g.  Deleting, destroying, erasing or otherwise making unavailable for further proceedings in this matter any Atlas business information, trade secrets, proprietary information, tangible or intangible property, and any information belonging to or relating to any Atlas customer or vendor which information

was improperly obtained by Kutrubes or Peak Serum during Kutrubes' employment with Atlas.

The Motion also requests that Defendants "return to Plaintiff (and remove from Defendants' access or possession) all documents, electronically stored information, databases, customer lists, vendor lists, or information derived from those things, which Defendant obtained from Plaintiff during the course of his employment with Plaintiff and his service as a director of Plaintiff." (Doc. # 5 at 22-24.) The Motion notes that Plaintiff "does **not** seek to prohibit Kutrubes or Peak Serum from competing in the marketplace for sales of pure FBS **only**." (Doc. # 4 at 10.)

Plaintiff further certified that it has provided notice of this cause of action and this motion for a temporary restraining order by emailing all pleadings in this case to Defendants through Defendants' legal counsel. (Doc. # 5 at 1.)

## II. <u>LEGAL STANDARD</u>

This Court's review of Plaintiffs' motion is governed by Federal Rule of Civil Procedure P. 65(b), which states:

**(b) Temporary Restraining Order.**

*(1)*     ***Issuing Without Notice.*** The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:

(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

(B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

In essence, a TRO "is designed to preserve the status quo until there is an opportunity to hold a hearing on the application for a preliminary injunction and may be issued with or without notice to the adverse party." Charles Alan Wright, et al., 11A Fed. Prac. & Proc. Civ. § 2951 (3d ed.

Apr. 2014 update).  Moreover, while "[t]he issuance of a temporary restraining order is a matter that lies within the discretion of the district court," a party must demonstrate "irreparable injury" as "an essential prerequisite to a temporary restraining order."  *Id.*  Most courts hold that a party "must demonstrate at least a reasonable probability of prevailing on the merits" in order to obtain such relief.  *Id.*

Finally, while a motion for a temporary restraining order is distinct from a motion for a preliminary injunction, some courts in the District of Colorado adhere to the same familiar four-part test for granting a preliminary injunction when considering whether to grant a temporary restraining order.  *See, e.g., Salba Corp., N.A. v. X Factor Holdings, LLC*, No. 12-CV-01306-REB-KLM, 2014 WL 128147 (D. Colo. Jan. 14, 2014).  That standard requires a plaintiff to demonstrate likelihood of success and irreparable harm but also "that the balance of equities tips in [Plaintiff's] favor, and that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).[4]

## III.  ANALYSIS

Plaintiff fulfills the standard for a temporary restraining order.  As an initial matter, Plaintiff has met the technical requirements of Rule 65(b) by alleging with specificity in an affidavit the immediate loss or injury that will be caused by Defendants' actions, *see* (Doc. ## 5-2 and 5-3), and by certifying in writing that it has provided notice to Defendant, *see* (Doc. # 5).

Further, this Court is persuaded that Plaintiff's request to enjoin Defendants from using Plaintiff's trademarks, proprietary information or trade secrets (including contacting customers in Atlas' database), meets the standard required for issuance of a temporary restraining order.

---

[4] While Courts in this district have considered these latter two factors, they can be considered at the discretion of the Court.  *See, e.g.*, Charles Alan Wright, et al., 11A Fed. Prac. & Proc. Civ. § 2951 (3d ed. Apr. 2014 update) ("The court also may balance the harm that might be suffered by defendant if the order were issued against the injury that would result to plaintiff if the application for the restraining order were denied.  This balancing of the hardships approach is fairly common, particularly when one of the parties is a governmental unit.  More generally, it also may be appropriate for the court to consider the effect of the requested order on the public interest." (footnotes omitted)).

First, Plaintiff has established a reasonable probability of success at least on their claim that Defendants violated 15 U.S.C. § 1125(a)(1) and C.R.S. § 7-74-103.  Indeed, the evidence demonstrates that Defendants attempted to replicate Atlas' proprietary and trade secret products, and have used statements indicating an affiliation with Atlas in order to garner sales – a textbook example of a "misleading representation" that "is likely to . . . deceive . . . as to the affiliation, connection, or association" of Defendants' product with the product produced by Plaintiff.  Similarly, given the very strict standard of loyalty to which Kutrubes was held as an employee, director, and shareholder of Atlas – and Kutrubes' conduct in soliciting customers and contractors while he was still employed by Atlas – it is likely that Plaintiff will succeed with respect to its breach of fiduciary duty claim.

Second, Plaintiff has established that failing to issue a Temporary Restraining Order will cause irreparable harm.  Common sense dictates that the Kutrubes' claims that Atlas was affiliated with Peak Serum and that Peak Serum's products were sourced from Atlas could diminish the Atlas brand in ways that Plaintiff will find difficult to correct.  Similarly, Defendants' use of Plaintiff's proprietary customer database could cause loss of goodwill as well as a loss of trade that cannot be remedied by money damages.

Third, the balance of equities tips in Plaintiff's favor.  In particular, the injunction will prevent Plaintiff from misappropriating Atlas' customer database, trade secret formulations and production methods – i.e., from doing what Defendants are already prohibited from doing.

Fourth, the public interest also tips in favor of preventing Defendants from introducing products that confuse consumers in the marketplace, as well as in enforcing Plaintiff's fiduciary duties.

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, it is

ORDERED that Ex Parte Motion for a Temporary Restraining Order and Preliminary Injunction (Doc. # 5) is granted.  It is further ORDERED that Defendants are enjoined from:

a.  Using the marks EquaFETAL, FETAL+PLUS, ATLAS, or ATLAS BIOLOGICALS in connection with Defendants' goods or services;

b.  Using any trademark, trade dress, service mark, name, logo, design or source designation of any kind on or in connection with Defendant's goods or services that is a copy, reproduction, colorable imitation, or simulation of, or confusingly similar to the trademarks, trade dress, service marks, names or logos of Atlas Biologicals, Inc.;

c.  Using any trademark, trade dress, service mark, logo, design or source designation of any kind on or in connection with Defendant's goods or services that is likely to cause confusion, mistake, deception, or public misunderstanding that such goods or services are produced or provided by Atlas Biologicals, Inc., are sponsored or authorized by Atlas Biologicals, Inc., or are in any way connected with, controlled by, or related to Atlas Biologicals, Inc.

d.  Using and further disclosing the proprietary information and trade secrets of Atlas Biologicals to produce bovine or equine serum based products, including EquaFETAL or blended or proprietary products based on Atlas' proprietary information and trade secrets;

e.  Producing products containing EquaFETAL or EquaFETAL in combination with other products;

10

      f.   Contacting any customer or prospective customer in Atlas Biologicals, Inc.'s customer list or database; and

      g.  Deleting, destroying, erasing or otherwise making unavailable for further proceedings in this matter any Atlas business information, trade secrets, proprietary information, tangible or intangible property, and any information belonging to or relating to any Atlas customer or vendor which information was improperly obtained by Kutrubes or Peak Serum during Kutrubes' employment with Atlas.

It is further

ORDERED that, pursuant to Fed. R. Civ. P. 65(b)(2), this order shall expire on  March 17, 2015, absent good cause shown for why the order should be extended, or consent by Defendants to extend the order.  It is further

ORDERED that, pursuant to Fed. R. Civ. P, 65(c), Plaintiff shall post a bond of $1000 as security.  It is further

ORDERED that Plaintiff shall provide notice of this order to Defendants.  It is further ORDERED that the Parties are instructed to call chambers together on a conference call (303-335-2174) in order to schedule time for a preliminary injunction hearing.  It is further

ORDERED that Plaintiff is to submit briefing as to why this Court should grant a motion for a preliminary injunction by no later than 5:00 p.m. on March 7, 2015.   Defendants are to submit a response no later than 5:00 p.m. on March 9, 2015.

DATED:          March 3, 2015

TIME:           9:56 AM


                                        BY THE COURT:


                                        CHRISTINE M. ARGUELLO
                                        United States District Judge