**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Christine M. Arguello**

Civil Action No. 15-cv-00355-CMA-KMT

ATLAS BIOLOGICALS, INC.,

      Plaintiff,

v.

THOMAS JAMES KUTRUBES, an individual,
PEAK SERUM, INC., a Colorado corporation, and
PEAK SERUM, LLC., a dissolved Colorado limited liability company,

      Defendants.

---

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

This case involves a dispute between a corporation and its former employee over whether the former employee ran afoul of his legal and contractual duties when he established a competing business before he left the employ of the corporation and, if so, the extent to which the corporation was damaged by its former employee's actions.

Beginning on March 5, 2018, the Court presided over a five-day bench trial on Plaintiff Atlas Biologicals, Inc.'s claims for: (a) federal trademark infringement, in violation of the Lanham Act, 15 U.S.C. § 1114; (b) false designation of origin and federal unfair competition, in violation of the Lanham Act, 15 U.S.C. § 1125; (c) trademark and trade name infringement under Colorado common law; (d) misappropriation of trade secrets, in violation of the Colorado Uniform Trade Secrets Act, Colo. Rev. Stat.

§§ 7-74-101, *et seq.*; (e) "conversion and civil theft" pursuant to Colo. Rev. Stat.

§ 18-4-405; (f) deceptive trade practices, in violation of the Colorado Consumer

Protection Act, Colo. Rev. Stat. § 6-1-105; (g) breach of fiduciary duty; and (h) breach of

contract, *see* (Doc. # 101), as well as Defendants Thomas Kutrubes, Peak Serum, Inc.,

and Peak Serum, LLC's affirmative defenses of: (a) successful mitigation of damages;

and (b) the doctrine of unclean hands, *see* (Doc. # 103). *See* (Doc. ## 131–35.)

Having heard the evidence presented at trial and reviewed the parties' proposed

findings of fact and conclusions of law (Doc. ## 154–55), the Court now enters its

findings of fact and conclusions of law.

## I. <u>FINDINGS OF FACT</u>

### A. THE PARTIES

Plaintiff Atlas Biologicals, Inc. ("Atlas") specializes in the production of bovine

serum[1]-based products that are used for cell culture and research in the medical,

veterinary, and biological sciences. (Doc. # 101 at 4.) Among bovine serum-based

products, fetal bovine serum is in particularly high demand because it is widely utilizable

in scientific research. (*Id.*) Fetal bovine serum is, as the name implies, derived from

blood drawn from a bovine fetus. (*Id.*) It is a byproduct of the commercial beef industry,

and its price rises and falls as the market for beef product fluctuates. (*Id.*) Atlas

developed and sells EquaFETAL, a proprietary product that meets the specifications of

fetal bovine serum but is purportedly more traceable, consistent in quality, and stable in

---

[1] Bovine serum is a product derived from cow blood; the serum is what remains after red blood cells are been centrifuged out. (Doc. # 101 at 4.)

pricing than fetal bovine serum.  (*Id.* at 5.)  Atlas, which maintains its principal office in Fort Collins, Colorado, owns and uses in commerce the registered mark EquaFETAL, in addition to the following registered or common law marks: FETAL+PLUS; PROGENISERUM; FETAL CHOICE; FETAL SELECT; ATLAS; ATLAS BIOLOGICALS; FETAL RESOURCE; and its logo.  (Doc. # 123 at 13–14.)  In 2014 and 2015, Richard "Rick" Paniccia was the president of Atlas and one of its owners (Paniccia Testimony, Doc. # 137 at 302); Brent Bearden was a partial owner (Bearden Testimony, Doc. # 139 at 555); and Michelle Cheever was the company's Director of Quality Assurance (Cheever Testimony, Doc. # 136 at 52).  Paniccia and Bearden remain partial owners of Atlas today.

Defendant Thomas Kutrubes was also a partial owner of Atlas in 2014 and 2015 and continuing through the trial; he had at all relevant times a 7% ownership interest in Atlas.  (Doc. # 101 at 5); *see* (Doc. # 103 at 3.)  Kutrubes began working for Atlas as an intern in 2005 and was hired as an employee in 2006, initially serving as a regional sales manager.  (Doc. # 101 at 6; Doc. # 11-7 at 1.)  In January 2010, Kutrubes became a shareholder in Atlas, owning 5% of its common stock.  (Doc. # 11-7 at 1.)  Atlas awarded Kutrubes an additional 1% of the common stock the following year.  (*Id.*)  On November 9, 2012, Atlas promoted Kutrubes to be its National Sales Manager.  (Doc. # 101 at 6.)  On the date of his promotion, Kutrubes signed a job description for that position; the document listed as one of 12 "key responsibilities" "[u]nderstand[ing] and adher[ing] to company policies and procedures."  (Doc. # 1-2.)  Atlas already had in a place a policy entitled "Control of Confidentiality/Proprietary Information" that prohibited

all employees from disclosing without the company's prior written authorization any "Confidential and/or Proprietary Information." (Doc. # 1-3 at 5.) Kutrubes was subsequently elected to Atlas's Board of Directors and, on January 1, 2013, was awarded an additional 1% of Atlas's common stock. (Doc. # 11-7 at 2.)

## B.    THE BEGINNINGS OF PEAK SERUM

Unbeknownst to Atlas, Kutrubes was developing a business plan to compete with Atlas while he was still in Atlas's employ. *See* (Doc. # 10-2.) The business plan stated that Kutrubes's company, Peak Serum, would specialize in bovine serum-based products and generate market share among American academic institutions, with a "secondary" emphasis on exporting products to "Korea, Japan, China, Italy, and Canada." (*Id.* at 2.) Kutrubues's business plan continued, "Prices will be more competitive, and direct competition [will] be from Atlas to a certain extent due to SereaTech [sic] sourcing." (*Id.* at 6.) On October 31, 2014, Kutrubes filed articles of organization for Defendant Peak Serum, LLC with the Colorado Secretary of State. (Doc. # 11-1.) On December 9, 2014, Kutrubes dissolved Defendant Peak Serum, LLC and incorporated Defendant Peak Serum, Inc. ("Peak Serum") as a for-profit Colorado corporation. (Doc. # 11-4.)

Beginning the fall of 2014, at roughly the same time Kutrubes was establishing Peak Serum and while still employed by Atlas, Kutrubes "took certain information, documentation, and data" from Atlas by emailing documents from his Atlas-provided email account to his personal Gmail account. (Doc. # 123 at 23; Cheever Testimony, Doc. # 136 at 72.) These documents included Atlas's customer contact lists, a supplier

4

agreement; its quality manual; its organizational chart; a contract manufacturing statement; proofs of labels; a marketing brochure; and email exchanges about Atlas's products, among others. *See* (Doc. ## 7-1–7-5.) Kutrubes also "sent certain emails to customers of [Atlas]" that contained Atlas's trademarks and trade names and "solicited business for his company, Peak Serum." (Doc. # 123 at 13.) In these emails, Kutrubes falsely represented to Atlas's customers that Atlas and Peak Serum were "sister companies," that Atlas was no longer conducting international business, and that Peak Serum would be assuming Atlas's international customers. *See* (Doc. ## 7-8–7-21, 8-1–8-21, 9-1–9-14.) Kutrubes also contacted Atlas's suppliers, contract manufacturers, and business partners, including SeraTec, Central Biomedia, and Rocky Mountain Biologicals, in attempt to secure product for Peak Serum. *See* (Doc. ## 10-12–10-18.) Kutrubes "admits he breached his duty of loyalty as an employee [of Atlas] between October 1, 2014, and continuing until his termination in December of 2014." (Doc. # 123 at 12.)

## C.     THE END OF THE EMPLOYMENT RELATIONSHIP

In mid-December 2014, Kutrubes informed Paniccia and Bearden that he was resigning from Atlas in order to independently sell fetal bovine serum. (Paniccia Testimony, Doc. # 138 at 369; Doc. # 101 at 6.) Kutrubes tendered a formal resignation letter to Atlas on December 16, 2014, with an effective date of December 19, 2014. (Doc. # 11-6.) He wrote that he was resigning "from employment" with Atlas and from his alleged role as a director of the company, despite his belief that he "did not perform the duties of a Director, such as overseeing the activities of the company" and did not

"serve as an officer for the corporation." (*Id.* at 1.) In response to Paniccia and Bearden's purported "request and desire that the company purchase [his] shares," Kutrubes requested a buyout of his shares "upon the recent appraisal of the company at $3,200,000.00" and thus requested "a lump sum payment in the amount of $224,000.00." (*Id.*)

In the days after Kutrubes's resignation, Atlas discovered that prior to his resignation, Kutrubes had used his Atlas-provided email address to send numerous company documents to his personal Gmail account and to extensively email Atlas's customers to solicit business for Peak Serum. (Cheever Testimony, Doc. # 136 at 67; Paniccia Testimony, Doc. # 138 at 373.) Cheever, responsible for preparing the desktop Kutrubes used at Atlas for a future employee, observed that the desktop was "surprisingly clean" of files and that "a lot" of Kutrubes's email history was "missing." (Cheever Testimony, Doc. # 136 at 67–68.) Cheever restored many of the files and emails that had been deleted from the desktop and notified Paniccia and Bearden of the sensitive nature of their content. (*Id.* at 73.) Upon advice of its counsel, Atlas then retained an information technology consultant, Dan Silva, to "run a restore" and preserve evidence on the desktop. (Paniccia Testimony, Doc. # 138 at 373; Silva Testimony, Doc. # 136 at 14.)

In light of what it discovered on the desktop Kutrubes had used while an employee, Atlas "decline[d] [Kutrubes's] resignation" and "instead terminate[d] his directorship and employment for cause" on December 27, 2014. (Doc. # 11-7.) In its letter to Kutrubes, Atlas detailed its findings in the "large volume of material" Kutrubes

had apparently deleted from the desktop and alleged that Kutrubes had breached his fiduciary duties as a director and a shareholder and breached his "employment agreement." (*Id*. at 4.) It demanded that Kutrubes and Peak Serum "immediately return to Atlas" and cease using all materials obtained from Atlas, surrender all shares of stock in Atlas, and "abandon all plans to commence business operations" similar to those conducted by Atlas. (*Id*.)

**D.    PROCEDURAL HISTORY**

Atlas initiated this action against Kutrubes and Peak Serum on February 20, 2015. (Doc. # 1.) Shortly thereafter, Atlas filed an *ex parte* motion for immediate injunctive relief. (Doc. # 5.) On March 3, 3015, the Court entered a temporary restraining order that enjoined Kutrubes and Peak Serum from:

> a. Using the marks EquaFETAL, FETAL+PLUS, ATLAS, or ATLAS BIOLOGICALS in connection with Defendants' goods or services;
> b. Using any trademark, trade dress, service mark, name, logo, design or source designation of any kind on or in connection with Defendant's goods or services that is a copy, reproduction, colorable imitation, or simulation of, or confusingly similar to the trademarks, trade dress, service marks, names or logos of Atlas Biologicals, Inc.;
> c. Using any trademark, trade dress, service mark, logo, design or source designation of any kind on or in connection with Defendant's goods or services that is likely to cause confusion, mistake, deception, or public misunderstanding that such goods or services are produced or provided by Atlas Biologicals, Inc., are sponsored or authorized by Atlas Biologicals, Inc., or are in any way connected with, controlled by, or related to Atlas Biologicals, Inc.
> d. Using and further disclosing the proprietary information and trade secrets of Atlas Biologicals to produce bovine or equine serum based products, including EquaFETAL or blended or proprietary products based on Atlas' proprietary information and trade secrets;
> e. Producing products containing EquaFETAL or EquaFETAL in combination with other products;
> f. Contacting any customer or prospective customer in Atlas Biologicals, Inc.'s customer list or database; and

g. Deleting, destroying, erasing or otherwise making unavailable for further proceedings in this matter any Atlas business information, trade secrets, proprietary information, tangible or intangible property, and any information belonging to or relating to any Atlas customer or vendor which information was improperly obtained by Kutrubes or Peak Serum during Kutrubes's employment with Atlas.

(Doc. # 17.)  The temporary restraining order was set to expire on March 23, 2015.

(Doc. # 38.)

The parties then stipulated to a partial entry of a preliminary injunction.  (Doc. # 26.)  The parties did not agree on whether it was permissible for Kutrubes and Peak Serum to contact any customer or prospective customer in Atlas's customer list or database, nor did they agree on the extent to which Kutrubes and Peak Serum could be ordered to return documents and information Kutrubes obtained from Atlas in the course of his employment.  (*Id.* at 3.)  The Court heard argument and received evidence on Atlas's request for a preliminary injunction on March 23, 2015.  (Doc. # 43.)  It ruled from the bench that, in the absence of a non-solicitation and non-compete agreement between Atlas and Kutrubes, it did not have the authority to enjoin Kutrubes and Peak Serum from contacting all customers and potential customers in Atlas's customer database.  (*Id.*)

The Court entered a preliminary injunction on March 25, 2015, enjoining Kutrubes and Peak Serum from:

a. Using the marks EquaFETAL, FETAL+PLUS, ATLAS, or ATLAS BIOLOGICALS in connection with Defendants' goods or services;
b. Using any trademark, trade dress, service mark, name, logo, design or source designation of any kind on or in connection with Defendant's goods or services that is a copy, reproduction, colorable imitation, or simulation of, or confusingly similar to the trademarks, trade dress, service marks, names or logos of Atlas Biologicals, Inc.;

c. Using any trademark, trade dress, service mark, logo, design or source designation of any kind on or in connection with Defendant's goods or services that is likely to cause confusion, mistake, deception, or public misunderstanding that such goods or services are produced or provided by Atlas Biologicals, Inc., are sponsored or authorized by Atlas Biologicals, Inc., or are in any way connected with, controlled by, or related to Atlas Biologicals, Inc.

d. Using and further disclosing the proprietary information and trade secrets of Atlas Biologicals to produce bovine or equine serum based products, including EquaFETAL or blended or proprietary products based on Atlas' proprietary information and trade secrets;

e. Producing products containing EquaFETAL or EquaFETAL in combination with other products; and

f. Deleting, destroying, erasing or otherwise making unavailable for further proceedings in this matter any Atlas business information, trade secrets, proprietary information, tangible or intangible property, and any information belonging to or relating to any Atlas customer or vendor which information was improperly obtained by Kutrubes or Peak Serum during Kutrubes's employment with Atlas.

(Doc. # 46 at 2–3.) The Court also ordered that, pursuant to the agreement the parties reached at the hearing, Kutrubes and Peak Serum were to permit Silva to obtain forensic copies of all drives and media. (*Id.* at 3.) Finally, the Court ordered Kutrubes and Peak Serum to return to Atlas "all information, documents, and things" Kutrubes took from Atlas. (*Id.*)

After more than a year of discovery, Atlas filed an Amended Complaint on November 14, 2016, asserting claims against Kutrubes and Peak Serum for: (a) federal trademark infringement, in violation of the Lanham Act, 15 U.S.C. § 1114; (b) false designation of origin and federal unfair competition, in violation of the Lanham Act, 15 U.S.C. § 1125; (c) trademark and trade name infringement under Colorado common law; (d) misappropriation of trade secrets, in violation of the Colorado Uniform Trade Secrets Act, Colo. Rev. Stat. §§ 7-74-101, *et seq.*; (e) "conversion and civil theft"

pursuant to Colo. Rev. Stat. § 18-4-405; (f) deceptive trade practices, in violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-105; (g) breach of fiduciary duty; (h) breach of contract; (i) unfair competition under Colorado common law; (j) copyright infringement pursuant to the federal Copyright Act, 17 U.S.C. § 504(b); and (k) attorneys' fees.  (Doc. # 101.)  Atlas subsequently withdrew its claims for unfair competition under Colorado common law and for federal copyright infringement.  *See* (Doc. # 130.)  Kutrubes and Peak Serum filed an Answer to the Amended Complaint on December 5, 2016.  (Doc. # 103.)  Kutrubes and Peak Serum denied all of Atlas's claims against them and asserted affirmative defenses of "the doctrine of unclean hands" and Atlas's "successful mitigation of damages," among others.  (*Id*. at 11–12.)

In advance of trial, the parties stipulated to the following facts:

1.   Defendant Thomas James Kutrubes admits he breached his duty of loyalty as an employee between October 1, 2014 and continuing until his termination in December of 2014. [Defendant Kutrubes does not admit an earlier breach of loyalty, but Plaintiff reserves the right to contend and put on evidence that Defendant Kutrubes breached his duty of loyalty beginning in 2013].

2. Defendant Thomas James Kutrubes admits that prior to his separation from employment with Plaintiff he sent certain emails to customers of Plaintiff and solicited business for his company, Peak Serum. Defendant Kutrubes admits that certain emails in which he solicited business for Peak Serum contained Plaintiff's trademarks and/or tradenames.

3. Defendant Thomas James Kutrubes admits that prior to his separation from employment, he took certain information, documentation, and data from Plaintiff. The parties, however, have not stipulated that such information, documentation, and data constitute information, documentation, and data which is proprietary or trade secret to Plaintiff.

4. Defendants stipulate that a permanent injunction should be issued restraining Defendants from infringing upon the website FAQ which Plaintiff alleges [D]efendants infringed, and in exchange for that stipulation Plaintiff waives a claim for attorney fees and damages with respect to the copyright infringement claim only.

5. The parties stipulate that the following trade marks were owned by

Plaintiff, were in use in commerce, and are valid registered or common law marks at
all relevant dates to this litigation:
   a. EQUAFETAL (U.S. Reg. No. 3,307,832)
   b. FETAL+PLUS (U.S. Reg. No. 4,086,021)
   c. PROGENISERUM (U.S. Reg. No. 4,354,970).
   d. FETAL CHOICE (U.S. Application serial no. 86/372,131)
   e. FETAL SELECT (U.S. Application serial no. 86/502,135)
   f. ATLAS (common law, as relates to the bovine serum industry)
   g. ATLAS BIOLOGICALS (common law, as relates to the bovine serum industry).
   h. FETAL RESERVE (common law, as relates to the bovine serum industry).
   i. The Atlas Biologicals' Logo depicting a carton figure of the mythical character Atlas holding a round bottom flask (common law, as relates to the bovine serum industry).

(Doc. # 123 at 12–14.)

The Court presided over a five-day bench trial between March 5, 2018, and March 9, 2018. *See* (Doc. ## 131–35.) Pursuant to the Court's direction on the last day of trial, the parties submitted proposed findings of fact and conclusions of law on May 17, 2018.[2] (Doc. ## 154–55.)

Approximately one month after trial, Atlas filed an Emergency *Ex Parte* Motion for Pre-Judgment Attachment and Injunctive Relief Against Further Conveyances of Assets by Kutrubes. (Doc. # 142.) Atlas alleged therein that on April 4, 2018, Kutrubes "purported to transfer all of his stock in [Atlas] to Biowest, LLC, a Missouri limited liability company, whose president and CEO is Wendell Leinweber." (*Id.* at 2.) However, Atlas continued, this transfer was unsuccessful (i.e., not completed) because "no endorsed

---

[2] The Court's ability to rule timely on this matter was hindered by the low quality of the parties' proposed findings of fact and conclusions of law, especially Atlas's submission (Doc. # 155-1), which lacks any organization and is riddled with typographical errors and incomplete sentences. In no circumstances would this Court be able, much less willing, to adopt such flawed submissions as part of its own order.

share certificate ha[d] been tendered nor a request for a transfer on the books and records of Atlas . . . ha[d] been made." (*Id.*)  The appropriate remedy, according to Atlas, was prejudgment attachment of Kutrubes's shares of its stocks pursuant to Colorado Rule of Civil Procedure 102(c).  (*Id.* at 6–7.)  Kutrubes responded in opposition, arguing that he had successfully transferred his stock to Biowest, LLC and requesting "an injunction preventing Atlas and its shareholders [and] officers . . . from holding any shareholder meetings, amending corporate bylaws, or otherwise taking actions that would impact any minority shareholder until such time as the dispute with respect to ownership of shares is resolved."  (Doc. # 145 at 8.)  The Court issued a Writ of Attachment on April 24, 2018, that ordered the Sheriff of Larimer County, Colorado, to "attach and safely keep any stock of [Atlas] owned by [Kutrubes]."  (Doc. # 147.)  The parties are litigating ownership of the shares in another matter, *Atlas Biologicals, Inc. v. Thomas James Kutrubes and Biowest, LLC*, 18-cv-00969-CMA-MEH.  The status of the shares has no bearing on Atlas's claims and Kutrubes's and Peak Serum's affirmative defenses in this matter.

## II.    <u>CONCLUSIONS OF LAW</u>

**A.    ATLAS'S CLAIM FOR FEDERAL TRADEMARK INFRINGEMENT AND CLAIM FOR COLORADO COMMON LAW TRADEMARK AND TRADE NAME INFRINGEMENT**

The Court addresses Atlas's claim for federal trademark infringement and its claim for Colorado common law trademark and trade name infringement together because the claims are comprised of nearly identical elements.

With regard to the federal claim, under the Lanham Act, a party infringes another's trademark when it uses a similar mark in commerce and "such use is likely to cause confusion."  15 U.S.C. § 1114(1)(a); *Team Tires Plus, Ltd. v. Tires Plus, Inc.*, 394 F.3d 831, 832–33 (10th Cir. 2005).  Section 32 of the Lanham Act allows the owner of a registered mark to bring a civil action for infringement against any person who "use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of [the] registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive."  *Id.*; *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1238 (10th Cir. 2013).  To establish a trademark infringement claim, the mark owner must prove that: (1) the mark is valid and protectable; (2) the defendant used the mark in commerce without consent; and (3) the defendant's use of the mark is likely to cause confusion.  *KMMentor, LLC v. Knowledge Mgmt. Prof'l Soc'y, Inc.*, 712 F. Supp. 2d 1222, 1241 (D. Kan. 2010) (citing *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045, 1050–57 (10th Cir. 2008)).

As to the Colorado common law claim, the Colorado Supreme Court "has consistently recognized and followed a policy of protecting established trade names and preventing public confusion, and the tendency has been to widen the scope of that protection."  *Wood v. Wood's Homes, Inc.*, 519 P.2d 1212, 1215–16 (Colo. App. 1974). The elements of common law trademark infringement in Colorado are virtually indistinguishable from those required to provide trademark infringement under the Lanham Act.  *Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1219 (10th Cir. 2004).

"[A] plaintiff must establish a protectable interest in its mark, the defendant's use of that mark in commerce, and the likelihood of consumer confusion." *Id.* Similar to federal trademark law, "[t]he test in Colorado is whether the public is likely to be deceived." *Wood*, 519 P.2d at 1216 (citing *Swart v. Mid-Continent Refrigerator Co.*, 360 P.2d 440 (Colo. 1961)).

The third element of these claims—the likelihood of confusion—is the key inquiry. *Team Tires Plus*, 394 F.3d at 833. The Court of Appeals for the Tenth Circuit has identified six factors that aid in determining whether a likelihood of confusion exists between two marks: (a) the degree of similarity between the marks; (b) the intent of the alleged infringer in adopting its mark; (c) evidence of actual confusion; (d) the relation in use and the manner of marking between the goods or services marketed by the competing parties; (e) the degree of care likely to be exercised by purchasers; and (f) the strength or weakness of the marks. *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1089–90 (10th Cir. 1999) (internal citation omitted). "No one factor is dispositive, and the final determination of likelihood of confusion must be based on consideration of all relevant factors." *Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 554 (10th Cir. 1998) (internal citation omitted).

Atlas alleges that Kutrubes infringed on its trademarks and trade names by "sen[ding] existing and prospective Atlas customers numerous emails" containing Atlas's marks and names in an effort to promote Peak Serum's products and by

"displaying prominently" on Peak Serum's Google+ webpage[3] Atlas's marks and names.  (Doc. # 101 at 11.)  Atlas asserts that Kutrubes's and Peak Serum's use of their trademarks and trade names was "knowing, intentional, [and] willful" and was "carried out with clear intent to trade on the reputation and goodwill associated with Atlas" and to "divert and harm Atlas'[s] business."  (*Id.* at 11–12.)

    1.    <u>Factual findings specific to the claims</u>

The parties stipulated to the first and second elements of the trademark infringement claims.  *See* (Doc. # 154 at 2.)  As to the first element, they agreed that Atlas owned and used in commerce valid registered or common law marks and names, including EQUAFETAL, ATLAS, and Atlas's logo at all relevant times.  (Doc. # 123 at 13–14.)  With respect to the second element, Kutrubes admitted that "certain emails in which he solicited business for Peak Serum contained [Atlas's] trademarks and/or trade names."  (*Id.* at 13.)  He also acknowledged at trial that for a time in 2015, the Google+ page for Peak Serum contained "all of the information" and "all of the testimonials" from Atlas's Google+ page.  (Kutrubes Testimony, Doc. # 140 at 796.)  The Court thus only makes findings of fact relevant to the third element, that Kutrubes's and Peak Serum's use of Atlas's marks was likely to cause confusion.

---

[3] The Court takes judicial notice that Google+ was an internet-based social network owned and operated by Google.  *See* F.R.E. 201.  It allowed small businesses and other users to create account pages viewable to the public.  Google shut down Google+ on April 2, 2019.  *Frequently asked questions about the Google+ shutdown*, GOOGLE, https://support.google.com/plus/answer/9217723?hl=en&ref_topic=9259565 (last visited Aug. 14, 2019).

In the emails that Kutrubes sent from his Atlas-provided account to Atlas's customers and prospective customers, Kutrubes explicitly referred to Atlas's products and included his email signature, which identified him as the National Sales Manager of Atlas and contained Atlas's contact information and logo. For example, in an email dated November 5, 2014, to Yunjeong Lee of Daemyung Science Co., Ltd., Kutrubes wrote that he was in the process of "trying to obtain a . . . [fetal bovine serum] source (separate from Atlas)" and was "going to form a new company in 2015 to help provide international customers the option of [fetal bovine serum] since Atlas has discontinued supply." (Trial Ex. 67 at 4.) He suggested to Lee that Daemyung could buy fetal bovine serum from his new company, put its "own serum label on the bottle[s]," and "sell Daemyung brand [fetal bovine serum]," which "would be easier than EquaFETAL." (*Id.*) At the bottom of the email, Kutrubes included his signature with Atlas's name, logo, and contact information. (*Id.*); *see* (Cheever Testimony, Doc. # 136 at 162; Trial Exs. 69, 70, 316, 369, 413, 421.)

Atlas's customers and potential customers were confused by Kutrubes's use of Atlas's marks and names in these promotional emails. Returning to the example of Kutrubes's email exchange with Lee of Daemyung, in response to Kutrubes's statement that he was going to form a new company separate and apart from Atlas because Atlas was discontinuing its supply of fetal bovine serum, Lee asked on behalf of Daemyung's chief executive officer, "Are you going to leave Atlas . . . and make a new company? Will Atlas . . . stop supplying all [fetal bovine serum] products from [sic] 2015? Can't we have FetalPlus or EquaFETAL since [sic] 2015?" (Trial Ex. 67 at 1.) Cheever

accurately characterized Lee's questions: "That is confusion." (Cheever Testimony, Doc. # 136 at 163); *see also* (Paniccia Testimony, Doc. # 138 at 403–10.) Paniccia testified that as a result of the confusion caused by Kutrubes's use of Atlas's marks and names in emails promoting Peak Serum, Atlas "lost a large block of business." (Paniccia Testimony, Doc. # 138 at 409.) The Court credits this testimony.

The Court finds that Kutrubes's intent in using Atlas's trademarks and trade names in these promotional emails was to benefit himself and his nascent business, Peak Serum. *See* (Doc. # 154 at 5.) By feeding Atlas's customers and prospective customers untruths about Atlas's product offerings, such as that Atlas was no longer supplying fetal bovine serum, *see* (Trial Ex. 67 at 4), Kutrubes sought to drive business away from Atlas and towards Peak Serum. That he was doing so in emails he signed as Atlas's National Sales Manager and sent from an Atlas-provided account only reinforces this finding. The Court does not find Kutrubes's self-serving testimony that he did not intend to confuse consumers and that he was also promoting Atlas's products in these emails to be sincere. *See* (Kutrubes Testimony, Doc. # 140 at 785, 799.)

The Google+ page Kutrubes created for Peak Serum also made use of Atlas's marks and names. Between January and March 2015, searching for "Atlas Biologicals" on Google would result in a Google+ sidebar for Peak Serum. (Trial Exs. 150, 152.) The sidebar included customer reviews that explicitly mentioned Atlas and its products. One review stated, "Equafetal works just as well as standard [fetal bovine serum] on all of the lines tested;" another read, "We have been purchasing [fetal bovine serum] from

Atlas Biologicals for almost 5 years.  Their customer service is perfect and the quality of their [fetal bovine serum] is top notch."  (*Id.*)

Atlas's customers were confused by the inclusion of Atlas's marks and names on Peak Serum's Google+ page.  The Court credits Cheever's testimony that Peak Serum's Google+ page "caused confusion because [Atlas's] customers were Googling Atlas, then Peak Serum show[ed] up, so they didn't understand that relationship." (Cheever Testimony, Doc. # 136 at 132.)  Kutrubes conceded at trial that he understood how Peak Serum's Google+ page "would be confusing to individuals."  (Kutrubes Testimony, Doc. # 140 at 799.)  To remedy the confusion, Atlas "had to explain to the customers the situation that Peak Serum is not associated with Atlas."  (Cheever Testimony, Doc. # 136 at 135–36.)

2.    Conclusion of law on the claims

Atlas has established by a preponderance of the evidence its trademark infringement claims.  As the Court previously explained, the parties stipulated to the first and second elements of the claims—that Atlas owned valid, protectable trademarks and trade names and that Kutrubes and Peak Serum used the marks and names in commerce without Atlas's consent.

In light of its factual findings, the Court concludes that Atlas has satisfactorily established the third element; Kutrubes's and Peak Serum's use of Atlas's marks and names was likely to cause confusion.  The Court weighs the six factors identified in *King of the Mountain Sports* as bearing on the likelihood of confusion.  *See* 185 F.3d at 1089–90.  First, the degree of similarity is at its maximum and weighs in favor of Atlas;

there is no dispute that Kutrubes used Atlas's **actual** trademarks and names in emails and on Peak Serum's Google+ page.  The second factor, the intent of the alleged infringer in adopting the marks, also weighs in favor of Atlas.  "The proper focus under this factor 'is whether defendant had the intent to derive benefit from the reputation or goodwill of plaintiff.'"  *Id.* at 1091 (quoting *Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1485 (10th Cir. 1987)).  Here, Kutrubes had such an intent; he purposefully used the reputation of Atlas and the goodwill associated with the company to funnel business from Atlas and to Peak Serum.

The third factor weighs in Atlas's favor to a lesser degree.  Although a plaintiff "need not set forth evidence of actual confusion to prevail in a trademark infringement action, . . . 'actual confusion in the marketplace is often considered the best evidence of likelihood of confusion.'"  *Id.* at 1092 (citing *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 929 (10th Cir. 1986); quoting *Universal Money Ctrs. v. American Tel. & Tel. Co.*, 22 F.3d 1527, 1529 (10th Cir. 1994)).  "However, 'isolated instances of actual confusion may be de minimis.'"  *Id.* (quoting *Universal Money Ctrs.*, 22 F.3d at 1535).  De minimis "evidence of some actual confusion does not dictate a finding of likelihood of confusion."  *Universal Money Ctrs.*, 22 F.3d at 1535 (citing *Woodsmith Pub. Co. v. Meredith Corp.*, 904 F.2d 1244, 1249 (8th Cir. 1990)).  Though the evidence establishes that some customers were confused by Kutrubes's and Peak Serum's use of Atlas's trademarks and trade names, Atlas has put into evidence only one specific example—the questions from Lee of Daemyung the Court cited above—of actual

confusion. Because there is only anecdotal, de minimis evidence of actual confusion, this factor weighs only slightly in favor of Atlas.

The fourth factor, the relation in use and the manner of marking between the goods or services marketed by the competing parties, supports the third element of Atlas's trademark infringement claims. "Typically, 'the greater the similarity between the products and services, the greater the likelihood of confusion.'" *King of the Mountain Sports*, 185 F.3d at 1092 (quoting *Universal Money Ctrs.*, 22 F.3d at 1532). The Tenth Circuit has explained:

> This is undoubtedly true when the action pertains to source or affiliation confusion. For example, *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 926 (10th Cir. 1986), involved two competing companies marketing very similar goods—sweetened salted peanuts—in the same manner. In that case, we found that this factor added strength to the position that a reasonable consumer would likely be confused as to the source of the peanuts.

*King of the Mountain Sports*, 185 F.3d at 1092. In this case, Atlas and Peak Serum were marketing very similar goods—fetal bovine serum and products derived therefrom—in the same manner. This adds strength to the view that a reasonable consumer would likely be confused as to the source of the serums. *See id*.

The Court concludes that the next factor, the degree of care likely to be exercised by serum purchasers, is neutral. "A consumer exercising a high degree of care in selecting a product reduces the likelihood of confusing similar trade names." *Heartsprings, Inc.*, 143 F.3d at 557. Consumers of bovine serum-based products use a high degree of care in selecting their products; they customarily test samples of various lots of serum before making any purchases. (Cheever Testimony, Doc. # 136 at 69–

70.)  Such care makes it less likely that customers would confuse the entity from which

they were purchasing serum.  However, in this case, Kutrubes's use of Atlas's marks

and names in emails seeking business for Peak Serum was likely to confuse customers,

regardless of how much care they used.

The final factor also supports Atlas's position that there was a high likelihood of

confusion from Kutrubes's and Peak Serum's use of its marks and names.  "The

stronger a trademark, the more likely that encroachment upon it will lead to . . .

confusion."  *King of the Mountain Sports*, 185 F.3d at 1093 (citing *First Sav. Bank,

F.S.B. v. First Bank Sys., Inc.*, 101 F.3d 645, 653 (10th Cir. 1996)).  "A strong trademark

is one that is rarely used by parties other than the owner of the trademark, while a weak

trademark is one that is often used by other parties."  *Universal Money Ctrs.*, 22 F.3d at

1533 (quoting *Exxon Corp. v. Texas Motor Exch.*, 628 F.2d 500, 505 (5th Cir. 1980)).

The Tenth Circuit considers two aspects of strength when assessing the relative

strength of a mark: (1) conceptual strength, "the placement of the mark on the

distinctiveness or fanciful-suggestive-descriptive spectrum," and (2) commercial

strength, "the marketplace recognition value of the mark."  *King of the Mountain Sports*,

185 F.3d at 1093 (quoting 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair

Competition* § 11:83 (4th ed. 1996)).  "Under the conceptual strength prong, the

categories, in descending order of strength, are: fanciful; arbitrary; suggestive;

descriptive; and generic."  *Id.*  Atlas's marks, especially its name and its logo, are

arbitrary in nature because they are comprised of words and symbols that are

commonly used "but which, when used with the goods . . . in issue, neither suggest nor

describe any ingredient, quality, or characteristic of those goods." *See id*. Atlas's

marks also have a high commercial strength in the bovine serum market, as is

evidenced by its customers' reviews. Therefore, Atlas's marks and names are quite

strong.

Considering all six of these factors, the Court concludes that Atlas has proven

that Kutrubes's and Peak Serum's use of its marks and names was likely to cause

confusion and thus has satisfied the third element of its trademark infringement claims.

*See Beer Nuts, Inc.*, 805 F.2d at 925. Given the parties' stipulations concerning the first

and second elements, Atlas has therefore proven by a preponderance of the evidence

their trademark infringement claims.

3.   Damages

The Lanham Act "explicitly prescribes the range of monetary remedies available

to a plaintiff who has successfully proven a trademark violation:" *W. Diversified Serv.,*

*Inc. v. Hyundai Motor America, Inc.*, 427 F.3d 1269, 1272 (10th Cir. 2005).

> When a violation of any right of the registrant of a mark . . . shall have been
> established in any civil action arising under this chapter, the plaintiff shall
> be entitled, . . . subject to the principles of equity, to recover (1) defendant's
> profits, (2) any damages sustained by the plaintiff, and (3) the costs of the
> action. . . . The court in exceptional cases may award reasonable attorney
> fees to the prevailing party.

15 U.S.C. § 1117(a). In the instant case, Atlas seeks "recovery of [Kutrubes's and Peak

Serum's] profits, Atlas'[s] damages, enhanced damages, costs, and reasonable attorney

fees." (Doc. # 101 at 12); *see* (Doc. # 155-1 at 9–11.)

The Court concludes that Atlas is entitled to an award of its actual damages and

reasonable attorneys' fees on these claims. However, the parties have stipulated that if

the Court makes permanent its preliminary injunction (Doc. # 46), Atlas will not seek damages or attorneys' fees on its trademark infringement claims. (Doc. # 123 at 13; Doc. # 155-1 at 31–32.) In accordance with the parties' wishes, *see* (Kutrubes Testimony, Doc. # 139 at 684), the Court enters a permanent injunction in lieu of a monetary award on Atlas's trademark infringement claims. The terms of the permanent injunction are laid out in Section III.

## B. ATLAS'S CLAIM OF FALSE DESIGNATION OF ORIGIN AND FEDERAL UNFAIR COMPETITION

The Lanham Act also "confer[s] protection against a myriad of deceptive commercial practices." *Res. Developers, Inc. v. Statue of Liberty-Ellis Island Found., Inc.*, 926 F.2d 134, 139 (2d Cir. 1991). Relevant here, Section 43 of the Lanham Act provides that:

> [a]ny person who . . . uses in commerce . . . any false designation of origin, false or misleading description of fact, or false or misleading representation of fact , which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods . . . by another person . . . shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A). This section "proscribes not only acts that technically qualify as trademark infringement, but also unfair competitive practices involving actual or potential deception." *Sunward Corp. v. Henry's Safety Supply Co.*, Civ. A. No. 89-A-1841, 1990 WL 73388, *10 (D. Colo. 1990) (quoting *Holiday Inns, Inc. v. Trump*, 617 F. Supp. 1443, 1466 (D.N.J. 1985)).

To establish a claim for false designation of origin, a plaintiff must establish that: (1) the defendant made false or misleading representations, descriptions, or

designations of origin; (2) the deception was likely to cause confusion among ordinarily prudent consumers as to the origin of the defendant's goods, the defendant's affiliation with the plaintiff, or the plaintiff's approval of the defendant's goods; (3) the defendant caused such deception to enter into commerce; and (4) the plaintiff was damaged by the deception. 15 U.S.C. § 1125(a)(1)(A); *see Cottrell, Ltd. v. Biotrol Int'l, Inc.*, 191 F.3d 1248, 1252 (10th Cir. 1999); *Polo Fashions, Inc. v. Diebolt, Inc.*, 634 F. Supp. 786, 789– 90 (D. Kan. 1986). Intent is not a necessary element of a claim under this section of the Lanham Act. *Polo Fashions, Inc.*, 634 F. Supp. at 790 (citing *Purolator, Inc. v. EFRA Distrib., Inc.*, 687 F.2d 554, 561 (1st Cir. 1982)).

As with the trademark claims, "the key to establishing a claim of false designation of origin lies in proving that the defendant's use of a trademark or packaging creates a likelihood of confusion." *Sunward Corp.*, 1990 WL 73388 at *10. The Tenth Circuit considers the same six factors to determine likelihood of confusion for a false designation claim as it does for a trademark infringement claim. *J.M. Huber Corp. v. Lowery Wellheads, Inc.*, 778 F.2d 1467, 1470 (10th Cir. 1985). The Court identified those six factors in its assessment of trademark infringement in Section II(A) above.

Atlas asserts that Kutrubes and Peak Serum willfully made misrepresentations that created among Atlas's customers the "false and misleading impression that Peak Serum's goods [were] manufactured by Atlas, affiliated with Atlas, connected or associated with Atlas, and/or endorsed, controlled, or approved by Atlas when, in fact, they [were] not." (Doc. # 101 at 12.) Atlas claims that Kutrubes and Peak Serum made such misrepresentations in two ways: first, by emailing Atlas's customers and

prospective customers from Kutrubes's Atlas-provided account in an effort to build Peak Serum's business, and second, by mislabeling Peak Serum's products.  (Doc. # 155-1 at 12.)

      1.   <u>Factual findings specific to the claim</u>

          a.   *Emails to Atlas's customers and prospective customers*

The Court made factual findings relevant to Kutrubes's emails from his Atlas-provided account to Atlas's customers and prospective customers in its discussion of Atlas's trademark infringement claims in Section II(A)(1) above.

          b.   *Labelling of products*

When manufacturers collect raw fetal bovine serum, they assign it a lot number, which enables the manufacturer to document all material used to make a particular final product.  (Cheever Testimony, Doc. # 137 at 210.)  According to industry best practices, a lot of serum is a uniform batch of product, and the entire batch is produced by a single manufacturer and on the same day.  (*Id.* at 232; Paniccia Testimony, Doc. # 137 at 322.)  Lot numbers are used in the analysis and labelling of serum-based products, and accurate labelling is critically important to consumers of such products because they depend on the product being what it is identified as and on it having a consistent character.  (Cheever Testimony, Doc. # 137 at 190–91.)

The Court finds that Kutrubes and Peak Serum mislabeled Peak Serum Lot 31C141.  On December 17, 2014, Peak Serum acquired 246 500ml bottles of fetal bovine serum, identified as Lot 20140331FS, from Rocky Mountain Biologicals, Inc. ("RMBIO"), one of its contract manufacturers.  (Trial Ex. 260 at 1; Cheever Testimony,

Doc. # 137 at 193–94.)  Approximately two months later, Kutrubes requested

documentation ("the slaughter house affidavit") on the lot he purchased from RMBIO so

that he could export the product to South Korea.  (Trial Ex. 260 at 2; Cheever

Testimony, Doc. # 137 at 194–95.)  In early March 2015, Kutrubes submitted an

affidavit to the United States Department of Agriculture's ("USDA") Animal and Plant

Health Inspection Service[4] ("APHIS") that averred, "RMBIO Lot 20140331FS was

purchased for further sale by Peak Serum . . .  Peak Serum Fetal Bovine Serum Lot

Number **31C141 is derived entirely from** [RMBIO] Lot Number 20140331FS."  (Trial

Ex. 260 at 3) (emphasis added).  Relying on Kutrubes's affidavit and other

documentation Peak Serum submitted, the USDA APHIS then issued documentation

approving of the export of Peak Serum's Lot 31C141 to Daemyung Sciences Co., Ltd. in

South Korea.  (*Id.* at 7.)  Despite buying only 246 bottles of serum from RMBIO, and

representing to the USDA that these 246 bottles made up the entirety of Peak Serum

Lot 31C141, Peak Serum went on to sell more than 1,036 bottles of serum labeled as

Peak Serum Lot 31C141.  (Trial Ex. 262.)  Peak Serum sold 600 bottles of serum

labeled as Peak Serum Lot 31C141 to Daemyung alone.  (*Id.*; Cheever Testimony, Doc.

# 137 at 207.)  As Cheever testified, Peak Serum's own records show that Peak Serum

sold more bottles of product labeled as Peak Serum Lot 31C141 than it had purchased

from RMBIO.  (Cheever Testimony, Doc. # 137 at 207–08.)  This is convincing evidence

---

[4] The Department of Agriculture's Animal and Plant Health Inspection Service certifies that
agricultural and food products produced in the United States and shipped to markets abroad
meet the importing countries' entry requirements.  (Cheever Testimony, Doc. # 137 at 196); *see
Trade*, USDA APHIS, https://www.aphis.usda.gov/aphis/ourfocus/importexport/trade/ct_trade
(last visited Aug. 22, 2019).

of mislabeling by Kutrubes and Peak Serum.  When presented with this evidence, Kutrubes conceded that "there definitely was an error" in Peak Serum's labeling and that "there was more than one lot that was inaccurate[ly]" labelled.  (Kutrubes Testimony, Doc. # 140 at 818.)

2.    Conclusion of law on the claim

The Court finds in favor of Atlas on its claim of false designation of origin and federal unfair competition.  First, Atlas has proven by a preponderance of the evidence that Kutrubes and Peak Serum made false and misleading representations, descriptions, or designations of origin about Atlas's offerings and Peak Serum's products.  Kutrubes and Peak Serum did so in the emails Kutrubes sent from his Atlas-provided account to Atlas's customer base and by mislabeling Peak Serum's product, as the Court explained in its findings of fact.  *See POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 107 (2014) ("The Lanham Act creates a cause of action for unfair competition through misleading . . . labeling.").

With respect to the second element of the claim, the Court concludes that Kutrubes's and Peak Serum's deception was likely to cause confusion among the consuming public.  Because the Tenth Circuit looks to same six factors to determine likelihood of confusion for a false designation claim as it does for a trademark infringement claim, *see J.M. Huber Corp.*, 778 F.2d at 1470, the Court's analysis is identical to the one it conducted in regard to Atlas's trademark infringement claims, detailed in Section II(A)(2) above.  The Court declines to repeat that analysis here.

It is indisputable that Atlas has satisfied the third element of this claim; Kutrubes and Peak Serum certainly caused their misrepresentations to enter commerce.

Finally, Atlas was damaged by Kutrubes's and Peak Serum's deceptive misrepresentations—specifically, by Kutrubes's misleading emails to Atlas's customers and prospective customers.  As the Court detailed in Section II(A)(1) above, these emails caused confusion in the market, which had a deleterious effect on Atlas's sales.

Having proved all four elements by a preponderance of the evidence, Atlas is entitled to judgment in its favor on its claim for false designation of origin and federal unfair competition.

3.     Damages

As the Court explained above in Section II(A)(3), the Lanham Act allows an award of three types of monetary remedies: (1) recovery of the defendant's profits, (2) damages sustained by the plaintiff, and (3) the costs of the action.  15 U.S.C. § 1117(a).  The Act also enables a Court to treble the plaintiff's actual damages: "In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount."  *Id.*  Though the Court has discretion to treble damages, subject to equitable considerations, in order to remedy a violation of the Lanham Act, any increase in an award of the plaintiff's damages must constitute compensation and not a penalty. *See id.*; *Novell, Inc. v. Network Trade Center, Inc.*, 25 F. Supp. 2d 1233, 1244 (D. Utah 1998); 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 30:91 (5th ed. 2019).

Atlas seeks to "recover profits, actual damages, enhanced damages, and other damages and may be provided by statute," as well as costs and reasonable attorneys' fees, on the basis of its claim for false designation of origin and federal unfair competition.  (Doc. # 101 at 12–13.)

Beginning with Atlas's actual damages, the Court finds that Atlas was damaged in the amount of $502,861.88.  Atlas has proven both causation and that amount of its actual damages.  *See* 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 30:72 (5th ed. 2019) ("Recovery of damages for trademark infringement is subject to the usual standards of damages: plaintiff must prove both causation and amount.").  The amount of Atlas's damages can be measured by the profits it lost because of Kutrubes's and Peak Serum's conduct.  *See id*. at § 30:79.  Atlas only lost profits as a result of this conduct in 2014 and 2015.  (Phillips Testimony, Doc. # 138 at 606; Trial Ex. 450 at 3.)  On the basis of the testimony and expert reports by Dr. Owen Phillips, Atlas's expert on damages, the Court determines that in the last quarter of 2014 and throughout 2015, Atlas lost profits in the amount of $502,861.88.[5]  Atlas is entitled to an award of this amount.

---

[5] The Court relies on Dr. Phillips's Second Supplemental Damage Report to make this determination.  *See* (Trial Ex. 450.)  Table 2 of that report shows for both 2014 and 2015 Atlas's actual product sales (second column) and Dr. Phillips's estimate of Atlas's product sales had Atlas not been damaged by Kutrubes and Peak Serum (third column).  (*Id*. at 8.)  For each year, Dr. Phillips then calculated the difference between Atlas's product sales and Atlas's estimated product sales without damages (fourth column).  (*Id.*)  Adding these two figures together (the differences in actual versus predicted product sales for 2014 and for 2015), Dr. Phillips determined that Atlas lost $1,744,058.00 in sales in 2014 and 2015 due to Kutrubes's and Peak Serum's conduct.  (*Id.*)  He multiplied that lost sales figure by Atlas's profit rate, 48.76%, *see* (Phillips Testimony, Doc. # 138 at 500–01), and arrived at a determination that Atlas lost $850,403.00 in profits in 2014 and 2015 because of Kutrubes and Peak Serum (*id.* at 506–08; Trial Ex. 450 at 4).  The Court does not take issue with Dr. Phillips's methodology for calculating

The Court declines Atlas's request that it also be awarded Kutrubes's and Peak Serum's profits.  (Doc. # 155-1 at 10–11.)  Under the Lanham Act, a plaintiff may recover disgorgement of the defendant's profits if it shows "willful action on the part of the defendant."  *Klein-Becker USA, LLC v. Englert*, 711 F.3d 1153, 1162 (10th Cir. 2013) (citing 15 U.S.C. § 1117(a)).  Additionally, before awarding disgorged profits, the Court "must weigh 'principles of equity'" because "disgorgement of profits is an equitable remedy."  *Id.* (quoting *Bishop v. Equinox Int'l Corp.*, 154 F.3d 1220, 1222 (10th Cir. 1998)).  The Court has "wide discretion" to fashion an appropriate equitable remedy.  *Id.* (citing *Bishop*, 154 F.3d at 1222.)  In this case, though Kutrubes's and Peak Serum's conduct was willful, an award of their profits would be inequitable because Atlas is already receiving an award of its lost profits.  "[A] plaintiff . . . generally cannot recover its lost profits in addition to the defendant's profits."  *United Phosphorous, Ltd. V. Midland Fumigant, Inc.*, 205 F.3d 1219, 1228 (10th Cir. 2000); *see also Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 408 F. Supp. 1219, 1241 (D. Colo. 1976) (declining to award the plaintiff defendant's profits in addition to an award of compensatory damages because "an accounting for profits as an equitable

---

Atlas's lost profits.  However, the evidence does **not** show that Kutrubes and Peak Serum infringed on Atlas's marks and names and made false representations throughout 2014; rather, Kutrubes and Peak Serum only did so in the final quarter of 2014.  *See* (Phillips Testimony, Doc. # 138 at 500.)  The Court therefore divides Dr. Phillips's calculation for Atlas's 2014 lost sales by four.  It finds that Atlas lost $237,568.00 in sales in 2014.  Adding Atlas's 2015 lost sales ($793,714.00) to that figure, Atlas lost a total of $1,031,300.00 in sales in 2014 and 2015 because of Kutrubes's and Peak Serum's violations of the Lanham Act.  The product of multiplying Atlas's total lost sales ($1,031,300.00) by its profit rate (48.76%) is $502,861.88, which represents Atlas's lost profits in 2014 and 2015.

remedy would result in an overcompensation to the plaintiff."); 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 30:73 (5th ed. 2019).

The Court grants in part Atlas's request to treble its actual damages. *See* (*id.* at 17.) Atlas requests that the Court award it the profits Peak Serum gained from selling mislabeled lots to Atlas's customers and that the Court triple that portion of the award pursuant to 15 U.S.C. § 1117(a) "based on Kutrubes's and Peak Serum's willful conduct in mislabeling their serum and to deter future misconduct." (*Id.*) In weighing the equities of the case, the Court finds that granting this request is appropriate. Here, Atlas lost sales to Peak Serum, Kutrubes and Peak Serum benefitted from Atlas's goodwill and reputation, and Kutrubes's and Peak Serum's mislabeling of Peak Serum Lot 31C141 were more likely than not willful. *See Electrology Lab., Inc. v. Kunze*, 169 F. Supp. 3d 1119, 1159 (D. Colo. 2016) (affirming the district court's trebling of actual damages where the plaintiff lost revenues and commissions, the defendant benefitted from the plaintiff's goodwill and reputation, and the defendant's actions were willful). Atlas has proven that Peak Serum made a profit of $60,475.00 on sales of Peak Serum Lot 31C141 to Atlas's former customers. (Trial Ex. 162.) Trebling that amount, as Atlas reasonably proposes, the Court awards Atlas an additional $181,425.00 in damages on this claim.

Atlas is entitled to an award of its attorneys' fees. The Lanham Act permits an award of attorneys' fees to the prevailing party only in "exceptional" cases. 15 U.S.C. § 1117(a). Though the Lanham Act does not define the term "exceptional," the Tenth Circuit has "long held that an 'exceptional case' is one in which the trademark

infringement is 'malicious, fraudulent, deliberate, or willful.'" *W. Diversified Serv., Inc.*, 427 F.3d at 1273 (quoting *VIP Foods, Inc. v. Vulcan Pet, Inc.*, 675 F.2d 1106, 1107 (10th Cir. 1982)). The Court concludes that this is an exceptional case that warrants an award of attorneys' fees to Atlas. The evidence shows that Kutrubes and Peak Serum deliberately used Atlas's marks and names to drive customers away from Atlas's products and to solicit business for Peak Serum, just as they deliberately made false representations to Atlas's customers and prospective customers. Therefore, Atlas is entitled to recover reasonable attorneys' fees under the Lanham Act. *See, e.g.*, *United Phosphorous, Ltd.*, 205 F.3d at 1232 (affirming the district court's decision to award attorneys' fees pursuant to the Lanham Act where the district court found the defendant deliberately mislabeled products, took unfair advantage of the plaintiff's trademark, and deceived the plaintiff's customers); *Hydril Co. v. Blowout Prevention, Inc.*, No. CIV-82-1990-E, 1983 WL 414, *8 (W.D. Okla. Nov. 8, 1983) (concluding that the plaintiff was entitled to reasonable attorneys' fees under the Lanham Act because the defendant's actions were deliberate).

Accordingly, the Court enters judgment in Atlas's favor on its claim of false designation of origin and federal unfair competition and awards it $684,286.88, plus reasonable attorneys' fees in an amount to be determined.

## C. ATLAS'S CLAIM FOR MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE COLORADO UNIFORM TRADE SECRETS ACT

Colorado's Uniform Trade Secrets Act ("CUTSA"), Colo. Rev. Stat. §§ 7-74-101, *et seq.*, allows the owner of a trade secret to recover damages caused by the misappropriation of a trade secret. *See generally* Colo. Rev. Stat. §§ 7-74-103, -104.

To prove misappropriation of a trade secret, the plaintiff must show: (1) that it possessed a valid trade secret; (2) that the trade secret was disclosed or used without its consent; and (3) that the defendant knew, or should have known, that the trade secret was acquired by improper means. *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 847 (10th Cir. 1993).

With respect to the first element, CUTSA defines a trade secret as:

> [T]he whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value. To be a "trade secret" the owner thereof must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes.

Colo. Rev. Stat. § 7-74-102(4). Factors to consider in determining whether a trade secret exists include:

> (1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129 (10th Cir. 2003) (quoting *Colo. Supply Co. v. Stewart*, 797 P.2d 1303, 1306 (Colo. App. 1990)). Information can be a trade secret notwithstanding the fact that some of its components are well-known. *Id.* (citing *Rivendell Forest Prods., Ltd. v. Georgia-Pacific Corp.*, 28 F.3d 1043, 1045 (10th Cir. 1994)).

"Improper means," as it is used in the third element of this claim, is defined as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Colo. Rev. Stat. § 7-74-102(1).

Atlas alleges that during Kutrubes's employment, Kutrubes misappropriated Atlas's trade secrets through "improper and deceptive means," including by "emailing, downloading, and copying those trade secrets from Atlas'[s] computers and [by] seeking information from other employees . . . without Atlas'[s] consent or knowledge." (Doc. # 101 at 15.) Atlas contends that the trade secrets Kutrubes misappropriated included its "customer database and other materials" containing customer information and its "proprietary product formulations." (Doc. # 155-1 at 18–19.) In its proposed findings of fact and conclusions of law, Atlas focuses exclusively on its customer database and related information. *See* (*id.*)

1. Factual findings specific to the claim

Atlas maintained a comprehensive database of information about its customers and prospective customers since 2001. (Paniccia Testimony, Doc. # 137 at 309–10.) It hosted this database on Act, a customer relationship management software application, until late 2014, when Atlas moved its customer database onto SAP Business One, a similar software application. (*Id.* at 310; Cheever Testimony, Doc. # 136 at 91.) The database contained customers' and prospective customers' contact information; information about their products; records of their interactions with Atlas, including sample and order records; and notes about when Atlas's salespeople should contact

them again.  *See generally* (Paniccia Testimony, Doc. # 137 at 309–15; Bearden

Testimony, Doc. # 139 at 562–68.)  Only some of the customers' and prospective

customers' contact information was publicly available on their websites.  (Paniccia

Testimony, Doc. # 137 at 313.)  Atlas's salespersons gathered the rest of the detailed

information in the database through internet research and targeted phone

conversations; indeed, developing leads and maintaining contact with customers was

Atlas's salespersons' primary function.  Bearden testified that "building up the customer

database for Atlas" was "everything" its sales employees "did from the time [they]

walked in the office, until the time [they] left."  (Bearden Testimony, Doc. # 139 at 563.)

He reasonably estimated that Atlas's employees put upwards of 4,000 hours of work

into the database each year and that Atlas cumulatively expended more than one

million dollars on its development.  (*Id.* at 566–68.)  In short, "a tremendous amount of

time and energy [went] into putting [the] database together," as Paniccia described.

(Paniccia Testimony, Doc. # 137 at 313.)

   The customer database gave Atlas a competitive advantage over its clients

because it empowered its salespersons to "stay in touch with people" at universities and

medical centers who might buy serum-based products.  (*Id.* at 314–15; Cheever

Testimony, Doc. # 136 at 113.)  The software also allowed database users to export

information into other files, such as mailing lists and sales records.  (Cheever

Testimony, Doc. # 136 at 105.)  The database was password-protected, and Atlas only

gave the password to employees that "would be inputting information into [it.]"  (*Id.* at

315.)

In late 2014, while he was still Atlas's National Sales Manager, Kutrubes emailed numerous documents containing information derived from Atlas's customer database from his Atlas-provided account to his personal email account. *See, e.g.*, (Trial Ex. 360.) For example, Kutrubes emailed a spreadsheet entitled "contact sheet for newsletter" to his personal account on November 3, 2014. (*Id.* at 3); *see also* (Doc. # 138; Cheever Testimony, Doc. # 136 at 81.) Cheever credibly testified that Atlas had derived this list of customers' and potential customers' email addresses from its customer database in preparation for sending a newsletter to its customers "so that [it] could send them updates about product information." (Cheever Testimony, Doc. # 136 at 79.) In another example, Kutrubes sent a spreadsheet entitled "Tom Kutrubes Sales 2014a" to his personal email address on October 1, 2014. (Doc. # 360 at 1); *see also* (Trial Ex. 33; Cheever Testimony, Doc. # 136 at 74–77.) Cheever explained that Atlas's salespersons maintained sales spreadsheets that, like the spreadsheet Kutrubes sent to his personal email account, contained "customer name, customer institution that [the customers] were from, the product that they were sold, the amount that they [were] sold . . . , and the price, as well as email and phone numbers"—the latter of which was obviously taken from Atlas's customer database. (Cheever Testimony, Doc. # 136 at 75.)

Kutrubes does not contest that he emailed these and other documents to his personal email address prior to his separation from Atlas. (Kutrubes Testimony, Doc. # 140 at 771–72.) The Court does not credit Kutrubes testimony that he emailed these documents to himself so that he could work for Atlas from his home. *See* (Kutrubes

Testimony, Doc. # 139 at 718–19; Kutrubes Testimony, Doc. # 140 at 772.)  Paniccia

testified that "none of [Atlas's] employees worked from home" and that he "never

observed Kutrubes doing so."  (Paniccia Testimony, Doc. # 140 at 896–97.)  Moreover,

Kutrubes conceded at trial that he was emailing documents from Atlas's server to his

personal email address while he was developing his own business because he was

looking for "suggestions" or "information of . . . what the possibility or likelihood would

be" of success.  (Kutrubes Testimony, Doc. # 140 at 779–80.)

Kutrubes did not have Atlas's permission to email documents containing

information from Atlas's customer database from his Atlas-provided account to his

personal email account or to use them to Peak Serum's benefit.  The Court credits

Bearden's testimony that Kutrubes "shouldn't have taken" this information from Atlas.

(Bearden Testimony, Doc. # 139 at 594–95.)  The Court also observes that Atlas's

confidentiality policy "prohibited without . . . prior written authorization and approval" the

disclosure of Atlas's "customer lists and accounts."  (Doc. # 10 at 4); *see* (Paniccia

Testimony, Doc. # 137 at 339–41.)  Kutrubes was aware of Atlas's prohibitions on the

disclosure of confidential, proprietary information.  (Paniccia Testimony, Doc. # 137 at

341.)

2.    Conclusion of law on the claim

Atlas has proven by a preponderance of the evidence all three elements of its

trade secrets misappropriation claim against Kutrubes and Peak Serum.  First, the

information contained in Atlas's customer database, and documents that were created

with the information it contained, constituted valid trade secrets under CUTSA, Colo.

Rev. Stat. 7-74-102(4).  Virtually all of the factors courts consider in determining whether a trade secret exists weigh in favor of that conclusion.  *See Harvey Barnett, Inc.*, 338 F.3d at 1129.  To begin, though some of the customers' contact information was available to the public on the customers' websites, the documents Kutrubes emailed from his Atlas-provided account to his personal email address contained far more than basic contact information.  Information about Atlas's past sales to the customers was not known outside of Atlas.  Second, only employees that needed to input data into Atlas's customer database had access to it.  Third, Atlas protected its customer database with a password.  Fourth, the information in the customer database gave Atlas a significant competitive advantage over its competitors.  Fifth, Atlas expended a great deal of effort and money over the course of more than ten years to collect the information contained in the customer database.  And finally, it would take others a similar amount of effort and money to acquire and duplicate the information contained in Atlas's customer database.  More generally, it is well established that customer lists can be trade secrets.  *See Electrology Lab., Inc.*, 169 F. Supp. 3d at 1154 (citing *Hertz v. Luzenac Grp.*, 576 F. 1103, 1113 (10th Cir. 2009) ("Colorado recognizes that a customer list can be a trade secret under the UTSA.")).

With respect to the second element of Atlas's claim, Kutrubes disclosed the trade secrets without Atlas's consent, as the Court explained in its factual findings.

Atlas has also proven the third and final element—that Kutrubes knew or should have known that he acquired the trade secrets by improper means—by a preponderance of the evidence.  Kutrubes knew of his duty to not disclose Atlas's

customer list without the company's approval; that duty was clearly articulated in Atlas's confidentiality policy, with which Kutrubes was familiar.

Accordingly, the Court finds in Atlas's favor on its claim for misappropriation of trade secrets under CUTSA.

3.    Damages

CUTSA entitles a plaintiff who has proven the misappropriation of trade secrets to injunctive relief and an award of damages against the defendant.  Colo. Rev. Stat. §§ 7-74-103, -104; *Electrology Lab., Inc.*, 169 F. Supp. 3d at 1154.  Atlas seeks both injunctive relief and an award of damages and its reasonable attorneys' fees for Kutrubes's and Peak Serum's misappropriation of its trade secrets.  (Doc. # 101 at 15.) However, Atlas does not specify what injunctive relief it seeks in its proposed findings of fact and conclusions of law; it does not mention injunctive relief for this claim at all. (Doc. # 155-1 at 22–23.)  The Court therefore presumes Atlas has withdrawn its prayer for injunctive relief regarding trade secrets and declines to award Atlas any additional injunctive relief beyond making the preliminary injunction permanent, which the Court addressed in Section II(A)(3) above.

Damages available under CUTSA "may include **both** the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss."  Colo. Rev. Stat. § 7-74-104(1) (emphasis added).  The damages for actual loss "may be measured by several different methods: an agreed value; plaintiff's lost sales or profits; or research and development damages." *Sonoco Prod. Co. v. Johnson*, 23 P.3d 1287, 1289 (Colo. App. 2001) (citing Johnson,

*Assessing Damages for Misappropriation of Trade Secrets*, 27 Colo.Law. 71 (Aug. 1998)).  Though compensatory damages are "often difficult to ascertain with certainty," the plaintiff is only entitled to an amount it "can establish with reasonable certainty by a preponderance of the evidence.  *Id.* (citing *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555 (1931); *Pomeranz v. McDonald's Corp.*, 843 P.2d 1378 (Colo. 1993)).  Additionally, "[i]f the misappropriation is attended by circumstances of fraud, malice, or a willful and wanton disregard of the injured party's right and feelings," CUTSA permits a court to award "exemplary damages in an amount not exceeding" the amount awarded for the plaintiff's actual loss and the unjust enrichment of the defendant.  Colo. Rev. Stat. § 7-74-104(2).  Similarly, where "willful and malicious misappropriation exists," a court may also "award reasonable attorney fees to the prevailing party."  Colo. Rev. Stat. § 7-74-104(5).

Atlas suggests that "the appropriate measure of damages are [its] lost profits for 2015," which, it asserts, amount to $850,403.00.  (Doc. # 155-1 at 22.)  However, Atlas concedes that any compensatory damages awarded on this claim "are duplicative" of the actual damages it claimed pursuant to the Lanham Act.  (*Id.* at 23.)  The Court determined that Atlas's actual damages resulting from Kutrubes's and Peak Serum's conduct were $502,861.88 and awarded Atlas that amount in Section II(B)(3) above.  Awarding Atlas additional lost profits for its trade secrets misappropriation claim would be duplicative, and the Court declines to do so.

Atlas also states that an award for Kutrubes's and Peak Serum's unjust enrichment in the amount of $681,946.81, representing Peak Serum's profit on sales

Kutrubes and Peak Serum made to Atlas's former customers, is warranted. (Doc. # 155-1 at 22.) The Court agrees, as Atlas has proven by a preponderance of the evidence that Peak Serum profited in that amount by making sales to Atlas's former customers. *See* (Trial Ex. 162 at 6; Bearden Testimony, Doc. # 139 at 604–05.)

Finally, the Court awards Atlas an additional $681,946.81 in exemplary damages on this claim. *See* Colo. Rev. Stat. § 7-74-104(2). In light of the evidence presented, including Kutrubes's concession that he had the development of Peak Serum in mind when he emailed Atlas's customer information to his personal account, *see* (Kutrubes Testimony, Doc. # 140 at 779–80), the Court finds that Kutrubes's and Peak Serum's misappropriation of the information in Atlas's customer database was attended by circumstances of willful and wanton disregard of Atlas's rights. *See Electrology Lab., Inc.*, 169 F. Supp. 3d at 1155 (awarding exemplary damages "[i]n light of the evidence presented."). $681,946.81, Peak Serum's profits from sales made to Atlas's former customers is the appropriate amount of exemplary damages because that is the amount the Court awarded to Atlas for Peak Serum's unjust enrichment. *See* Colo. Rev. Stat. § 7-74-104(2) (exemplary damages are to be awarded "in an amount not exceeding the award made" for actual loss and unjust enrichment damages.").

Finally, in light of the Court's conclusion that Kutrubes's and Peak Serum's misappropriation of Atlas's trade secrets was willful and malicious, an award of reasonable attorneys' fees is also appropriate. *See* Colo. Rev. Stat. § 7-74-104(5); *cf. Weibler v. Universal Tech., Inc.*, 29 F. App'x 551, 554 (10th Cir. 2002) (affirming that

attorneys' fees were not warranted where the plaintiff had not shown that the defendant had taken "deliberate action which is normally associated with willful acts.").

In sum, the Court awards Atlas a total of $1,363.893.62, plus reasonable attorneys' fees, for Kutrubes's and Peak Serum's willful and wanton misappropriation of trade secrets.

## D.    ATLAS'S CLAIM FOR CONVERSION AND CIVIL THEFT

The Colorado Criminal Code permits a property owner to maintain a civil theft action against the taker of the property.  Colo. Rev. Stat. § 18-4-405.  Theft includes two culpable mental states among its elements: (1) that the defendant knowingly obtained control over the owner's property without authorization, and (2) that he or she did so with the specific intent to permanently deprive the owner of the benefit of property.  *Itin v. Ungar*, 17 P.3d 129, 134 (Colo. 2000) (citing Colo. Rev. Stat. § 18-4-401(1)(a)).  This requirement is the same where a plaintiff asserts a claim for conversion under Colo. Rev. Stat. § 18-4-405 or a claim for theft of a trade secret under Colo. Rev. Stat. § 18-4-408.  *See Kingvision Pay-Per-View, Ltd. v. Gutierrez*, 544 F. Supp. 2d 1179, 1183 (D. Colo. 2008).

Atlas asserts a claim for "conversion and civil theft" pursuant to Colo. Rev. Stat. § 18-4-405 on the grounds that Kutrubes and Peak Serum "tortuously and/or knowingly obtained . . . or exercised control over Atlas'[s] documents and information."  (Doc. # 101 at 15–17.)

The Court denies Atlas's claim for conversion and civil theft because Atlas has not proven by a preponderance of the evidence that Kutrubes and Peak Serum

intended to permanently deprive Atlas of the benefit of its documents and information contained therein. The Court made its findings of fact and conclusions of law regarding this claim from the bench on March 9, 2018, at the conclusion of the trial. *See* (Doc. ## 135, 140 at 899–901.)

## E. ATLAS'S CLAIM FOR DECEPTIVE TRADE PRACTICES IN VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT

The Colorado Consumer Protection Act ("CCPA"), Colo. Rev. Stat. §§ 6-1-101, *et seq.*, "was enacted to regulate commercial activities and practices which, 'because of their nature, may prove injurious, offensive, or dangerous to the public.'" *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 143, 146 (Colo. 2003) (quoting *People ex rel. Dunbar v. Gym of America, Inc.*, 493 P.2d 660, 667 (Colo. 1972)). The CCPA "deters and punishes businesses which commit deceptive practices in their delaings with the public by providing prompt, economical, and readily available remedies against consumer fraud." *Id.* (citing *Showpiece Homes, Corp. v. Assurance Co. of America*, 38 P.3d 47, 50–51 (Colo. 2001)). To prove a private cause of action under the CCPA, a plaintiff must show:

> (1) that the defendant engaged in an unfair or deceptive trade practice;
> (2) that the challenged practice occurred in the course of defendant's business, vocation, or occupation;
> (3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property;
> (4) that the plaintiff suffered injury in fact to a legally protected interest; and
> (5) that the challenged practice caused the plaintiff's injury.

*Id.* (citing *Hall v. Walter*, 969 F.2d 224, 235 (Colo. 1998)).

With respect to the first element, "[t]he CCPA specifies nearly fifty different types of deceptive trade practices." *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d

1111, 1120 (10th Cir. 2008); *see* Colo. Rev. Stat. § 6-1-105(1). Relevant here, a person engages in a deceptive trade practice when he or she "[e]ither knowingly or recklessly makes a false representation as to the characteristics, ingredients, uses, [or] benefits . . . of goods, food, services, or property or a false representation as to the sponsorship, approval, status, affiliation, or connection of a person therewith," Colo. Rev. Stat. § 6-1-105(1)(e), or "[d]isparages the goods, services, property, or business of another by false or misleading representation of fact," Colo. Rev. Stat. § 6-1-105(1)(h). To be actionable under the CCPA, a false representation "must either induce a party to act, refrain from acting, or have the capacity or tendency to attract consumers." *Rhino Linings USA, Inc.*, 62 P.3d at 147. The CCPA does not specifically define 'disparagement' anywhere, but courts have held that as it is used in the CCPA, disparagement is defined by its "common meaning." *Dunbar*, 493 P.2d at 667.

Regarding the third element of significant public interest, "the challenged practice must significantly impact the public as actual or potential customers of the defendant's goods, services, or property." *Hall*, 969 F.2d at 234.

> Some of the considerations relevant to whether a challenged practice significantly impacts the public as consumers are the number of consumers directly affected by the challenged practice, the relative sophistication and bargaining power of the consumers affected by the challenged practice, and evidence that the challenged practice previously has impacted other consumers or has significant potential to do so in the future.

*Martinez v. Lewis*, 969 P.2d 213, 222 (Colo. 1998). The Colorado Supreme Court has recognized that "[w]hen a transaction is no more than a private dispute, . . . 'it may be more difficult to show that the public has an interest in the subject matter.'" *Rhino Linings USA, Inc.*, 62 P.3d at 147 (quoting *Hall*, 969 F.2d at 238 (Scott, J., dissenting)

(citing *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 538 (Wash. 1986))).

Atlas alleges that Kutrubes and Peak Serum engaged in deceptive trade practices by (1) making "false representations that Peak Serum and Peak Serum's goods [were] affiliated, connected, associated with, or certified by Atlas" and (2) "mislabel[ing] [Peak Serum's] products in order to make sales to Atlas'[s] existing and prospective customers."  (Doc. # 101 at 17–18; Doc. # 155-1 at 24.)  It asserts that such trade practices "significantly impact[ed] the consuming public of bovine serum products," especially "consumers acting in reliance on Atlas'[s] good reputation and history of quality products in dealing with Peak Serum."  (Doc. # 101 at 17.)

     1.    <u>Factual findings specific to the claim</u>

         *a.*    *Emails to Atlas's customers and prospective customers*

The Court made factual findings relevant to Kutrubes's emails from his Atlas-provided account to Atlas's customers and prospective customers in its discussion of Atlas's trademark infringement claims in Section II(A)(1) above.

         *b.*    *Labelling of products*

The Court made factual findings relevant to Kutrubes's and Peak Serum's mislabeling of Peak Serum Lot 31C141 in its analysis of Atlas's false designation of origin and federal unfair competition claim in Section II(B)(1)(b) above.

     2.    <u>Conclusion of law on the claim</u>

The Court denies Atlas's claim for deceptive trade practices under the CCPA because Atlas has not proven by a preponderance of the evidence the third element of

the claim, that Kutrubes's and Peak Serum's deceptive trade practices significantly impacted the public as actual or potential consumers of Peak Serum's products. The Court arrives at this conclusion upon consideration of the factors identified in *Martinez v. Lewis* as "relevant to whether a challenge practice significantly impacts the public." *See* 969 P.2d at 222. First, the number of consumers directly affected by Kutrubes's and Peak Serum's false representations was relatively low. Kutrubes only sent emails on behalf of Peak Serum to a limited number of Atlas's customers and prospective customers; he did not spread the false representations via a website that any member of the public could access, nor did he contact the entirety of Atlas's customer base. *See, e.g.*, (Trial Ex. ## 316, 413, 421.) Similarly, the mislabeling on Peak Serum Lot 31C141 only affected a handful of consumers—the 14 customers that purchased from Peak Serum bottles of Lot 31C141.[6] *See* (Trial Ex. # 162; Doc. # 155-1 at 25.) In short, Kutrubes's and Peak Serum's false representations had a limited reach and did not significantly affect the public. *See Rhino Linings USA, Inc.*, 62 P.3d at 150 ("Three affected dealers out of approximately 550 worldwide does not significantly impact the public, especially where the proper remedy . . . is a private breach of contract action."); *cf. Hall*, 969 P.2d at 235 ("there is no dispute that . . . deceptive practices implicated the public as consumers because the misrepresentations were directed to the market generally, take the form of widespread advertisement.").

---

[6] A more proper remedy for this mislabeling may have been available in actions brought against Peak Serum by the customers who purchased mislabeled bottles of Peak Serum Lot 31C141.

Second, the sophistication of the consumers affected by Kutrubes's and Peak Serum's false representation weighs against a finding of significant public impact.  As the Court described in Section II(B)(2) above, consumers of bovine serum-based products exercise a high degree of care in selecting products to purchase, customarily sampling products before ordering them.  *See Martinez*, 969 P.2d at 222 (where the consumer had "ample access to information" regarding the services offered and had "extensive experience as a consumer of this type of service," concluding that the consumer was "[u]nlike the consumers contemplated by the CCPA").

And third, Atlas does not allege that Kutrubes's and Peak Serum's deceptive trade practices previously impacted other consumers or has the significant potential to do so in the future.  The Court therefore concludes that Kutrubes's and Peak Serum's false representations did not, under these facts, significantly impact the public as consumers of Peak Serum's products.  "[T]he CCPA was not intended as a remedy in such circumstances."  *Martinez*, 969 P.2d at 222.

Because Atlas fails to establish the third element of this claim, the Court need not address the remaining elements.  The Court denies Atlas's claim for deceptive trade practices in violation of the CCPA.

## F.      ATLAS'S CLAIM FOR BREACH OF FIDUCIARY DUTY

A claim for breach of fiduciary duty is a tort aimed at remedying economic harm suffered by one party due to a breach of duties owed in a fiduciary relationship.  *Rocky Mountain Exploration, Inc. v. Davis Graham & Stubbs LLP*, 2018 CO 54, ¶ 60 (citing *Accident & Injury Med. Specialists, P.C. v. Mintz*, 2012 CO 50, ¶ 21).  To recover on a

claim for breach of fiduciary duty, a plaintiff must prove: "1) that the defendant was acting as a fiduciary of the plaintiff; 2) that he breached a fiduciary duty to the plaintiff; 3) that the plaintiff incurred damages; and 4) that the defendant's breach of fiduciary duty was a cause of the plaintiff's damages." *Graphic Directions, Inc. v. Bush*, 862 P.2d 1020, 1022 (Colo. App. 1993) (citing CJI-Civ.2d 26:1 (1989)).

As is evident from the first element of this claim, "[a] prerequisite to finding a fiduciary duty is the existence of a fiduciary relationship." *Moses v. Diocese of Colo.*, 863 P.2d 310, 321 (Colo. 1993). "A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Accident & Injury Med. Specialists, P.C.*, ¶ 21 (quoting *Moses*, 863 P.2d at 321).

With regard to the second element, the duties of care owed by a fiduciary, which are independent of any contractual duties, "include a duty to act with the utmost loyalty on behalf of, and for the benefit of, the other party." *Accident & Injury Med. Specialists, P.C.*, ¶ 23 (citing *Bernhard v. Farmers Ins. Exch.*, 915 P.2d 1285, 1289 (Colo. 1996)).

Atlas alleges that Kutrubes had fiduciary duties to Atlas because "of his status as an employee," "as a director," and as a "shareholder" of Atlas. (Doc. # 101 at 18.) Specifically, it contends that Kutrubes breached his duty of loyalty to Atlas by "soliciting customers of Atlas to do business with his competing business Peak Serum during the term of his employment with Atlas" and by "usurping corporate opportunities of Atlas." (*Id.* at 18–19.) Atlas also argues that Kutrubes continues to violate fiduciary duties by "engaging in transactions which had their inception before the termination of the

fiduciary duties . . . to Atlas based on information obtained during that relationship." (*Id.* at 19.)

1.    <u>Factual findings specific to the claim</u>

No additional findings of fact are necessary to address Atlas's claim of breach of fiduciary duties.

2.    <u>Conclusion of law on the claim</u>

Atlas has proven by a preponderance of the evidence that Kutrubes breached his fiduciary duties as an employee and director between October 1, 2014, and the date Atlas terminated him, December 27, 2014.

   *a.    Breach of fiduciary duties between October 1, 2014, and December 27, 2014*

   *i.    <u>Kutrubes's fiduciary duties</u>*

Because Kutrubes was an employee, he was a fiduciary of Atlas and owed it a fiduciary duty—specifically, the duty of loyalty. *See Jet Courier Serv., Inc. v. Mulei*, 771 P.2d 486, 491–94 (Colo. 1989) (discussing the scope of an employee's duty of loyalty to his employer). One facet of an employee's duty of loyalty to his employer is the employee's "duty not to compete with the [employer] concerning the subject matter of his [employment]." *Id.* at 492–93 (quoting Restatement (Second) of Agency § 393 (1957)). Relevant here, an employee violates his duty of loyalty by engaging "pre-termination solicitation of customers for a new rival business." *Id.* (citing *AGA Aktiebolag v. ABA Optical Corp.*, 441 F. Supp. 747, 754 (E.D.N.Y. 1977) (holding that an employee owes a fiduciary duty to his employer and must exercise the utmost good faith and loyalty in the performance of his duties while employer)). However, as a

general principle, "an employee may compete with his employer **after the termination** of his employment" where, like here, this is no contrary agreement. *Id.* (emphasis added).

Kutrubes's status as a director of Atlas also imposed fiduciary duties. Specifically, "[t]he officers, directors, and controlling shareholders of a corporation have a fiduciary duty to act in good faith and in a manner they reasonably believe to be in the interests of the corporation and all its shareholders." *Colt v. Mt. Princeton Trout Club, Inc.*, 78 P.3d 1115, 1119 (Colo. App. 2003) (citing *Michaelson v. Michaelson*, 939 P.2d 835 (Colo. 1997)), *cert. denied*, No. 03SC240, 2003 WL 22472186 (Colo. Nov. 3, 2003); *River Mgmt. Corp. v. Lodge Prop. Inc.*, 829 P.2d 398, 401 (Colo. App. 1981). "This duty encompasses the requirement that directors of a corporation and its controlling shareholders act with an extreme measure of candor, unselfishness, and good faith in relation to remaining shareholders." *Van Schaack Holdings, Ltd. v. Van Schaack*, 867 P.2d 892, 897 (Colo. 1994) (citing *Wright v. Bayly Corp.*, 587 P.2d 799 (Colo. App. 1978)).

After Atlas terminated Kutrubes as an employee and director on December 27, 2014, Kutrubes no longer owed Atlas these fiduciary duties.

## ii. *Kutrubes's breach of his fiduciary duties*

Based on the evidence presented at trial, the Court concludes that Kutrubes breached his fiduciary duties to Atlas from October 1, 2014, until he was terminated on December 27, 2014, by making misrepresentations to Atlas's customers and prospective customers about Atlas's product offerings and by soliciting their business on

behalf of Peak Serum.  Kutrubes concedes that by so doing, he breached his duty of loyalty as an employee.  (Doc. # 123 at 12.)  The Court concludes that this conduct also amounts to a breach of his fiduciary duties as a director; Kutrubes plainly was not acting in good faith.  *See Colt*, 78 P.3d at 1119.

### iii.  *Kutrubes's breach caused Atlas's damages*

Kutrubes's breach of fiduciary duties between October 1, 2014, and December 27, 2014, caused Atlas to incur $30,618.09 in damages—the amount of compensation Atlas paid Kutrubes in that time period.  Kutrubes stipulates that he caused Atlas to suffer a loss in this amount.  (Kutrubes Testimony, Doc. # 139 at 684; Trial Ex. 18 at 78–85.)

Having satisfied all four elements of the claim by a preponderance of the evidence, Atlas has proven that Kutrubes breached his fiduciary duties between October 1, 2014, and December 27, 2014.  Atlas is entitled to an award of $30,618.09 in damages.

### b.  *No duties after December 27, 2014*

Atlas has not proven, however, its claim to the extent that it is based on Kutrubes's conduct as a shareholder after his termination from his employment and directorship on December 27, 2014.  Atlas's claim of continuing breaches of a fiduciary duty fails at the first element; it has not established that Kutrubes's ownership of 7% of Atlas's shares imbues him with fiduciary duties that carry on past his termination.  *See generally* (Doc. # 155-1 at 28.)  Moreover, the case law that this Court located speaks only to the duties of **controlling/majority** shareholders.  *See, e.g.*, *Van Schaack*

*Holdings, Ltd.*, 867 P.2d at 897; *River Mgmt. Corp.*, 829 P.2d at 401.  With only a 7%

stake, Kutrubes is not a controlling shareholder.

In sum then, the Court enters judgment in Atlas's favor on its claim for breach of

fiduciary duty to the extent it concerns Kutrubes's conduct between October 1, 2014,

and December 27, 2014, and awards Atlas $30,618.09 in damages.

## G.     ATLAS'S CLAIM FOR BREACH OF CONTRACT

In its Amended Complaint, Atlas alleges that Kutrubes breached a contract

"governing the terms and conditions of his ongoing employment with Atlas," which

purportedly included a provision concerning compliance with company policies and

procedures.  (Doc. # 101 at 19–20.)  Atlas maintained its breach of contract claim

through trial, and the Court instructed the parties at the close of trial to address it in their

proposed findings of fact and conclusions of law.  (Doc. # 140 at 912–13.)  Atlas does

not address its breach of contract claim in its post-trial briefing.  *See generally* (Doc.

# 155-1.)  The Court presumes Atlas has withdrawn its breach of contract claim and

declines to enter judgment on it.

## H.     KUTRUBES'S AND PEAK SERUM'S AFFIRMATIVE DEFENSES

Kutrubes and Peak Serum maintained two affirmative defenses during trial: "the

doctrine of unclean hands" and Atlas's "successful mitigation of damages."  *See* (Doc.

# 103 at 11–12.)

1.     <u>Affirmative defense of unclean hands</u>

A party requesting equitable relief from the courts must do so with "clean hands."

*Salzman v. Bachrach*, 996 P.2d 1263, 1269 (Colo. 2000).  Thus, a party engaging in

improper or fraudulent conduct relating in some significant way to the subject matter of the cause of action may be ineligible for equitable relief. *Id.* In order for the doctrine of unclean hands to apply, the improper conduct must relate directly to the underlying litigation. "In other words, the inequitable conduct must have an immediate and necessary relation to the claims under which relief is sight." *Ajay Sports, Inc. v. Casazza*, 1 P.3d 267, 276 (Colo. App. 2000).

Kutrubes and Peak Serum assert that Atlas has unclean hands because Bearden maintained another company, Cell Generation, that was also in the business of distributing bovine serum-based products. The Court finds that Defendants have not proven that Atlas has unclean hands. Cell Generation does not have an immediate and necessary relation to Atlas's claims against Kutrubes and Peak Serum. Kutrubes's plea for "fairness" and his attempt to show that Bearden also breached his duties to Atlas is neither immediately nor necessarily related to Atlas's claims against him and Peak Serum. The doctrine of unclean hands requires more than just an allegation that life is unfair. The Court made its findings of fact and conclusions of law regarding this affirmative defense from the bench at the conclusion of the trial. *See* (Doc. ## 135, 140 at 901–02.)

      2.    <u>Affirmative defense of mitigation of damages</u>

Under Colorado law, "it is well settled that a party aggrieved by a breach of contract must take reasonable steps to mitigate or minimize its damages." *United States Welding, Inc. v. Advanced Circuits*, 2018 CO 56, ¶ 9 (citing *Fair v. Red Lion Inn*, 943 P.2d 431, 437 (Colo. 1997)). "This means that the plaintiff may not recover

damages for injuries which he or she reasonably might have avoided." *Ballow v. PHICO Ins. Co.*, 878 P.2d 672, 680 (Colo. 1994) (citing *Valley Dev. Co. v. Weeks*, 364 P.2d 730, 733 (Colo. 1961)). "Mitigation or failure to mitigate is an affirmative defense that may be raised by the defendant, and the defendant bears the burden of proving the defense." *Fair*, 943 P.2d at 437. Accordingly, the defendant must prove that the plaintiff, the injured party, "fail[ed] to take reasonable steps to minimize the resulting damages." *Id.*

Kutrubes and Peak Serum assert that Atlas "failed to mitigate its damages by not making reasonable efforts to compete with [Kutrubes and Peak Serum] in sales of [fetal bovine serum" after it terminated Kutrubes. (Doc. # 154 at 30.) They contend that "[a] reasonable approach" for Atlas would have been for it "to engage with customers and contacts in an effort to sell fetal bovine serum." (*Id.*)

The Court concludes that Kutrubes and Peak Serum have not proven this affirmative defense. The evidence shows quite the opposite: Atlas engaged in a good faith effort to recoup the losses Kutrubes's conduct had caused it. For example, Bearden explained that Atlas circulated a letter to its clients in January 2015 to explain Kutrubes's departure from the company and to "contain the damages" and that Atlas then "[b]uilt up the sales staff and hired three more people." (Bearden Testimony, Doc. # 139 at 603.) Paniccia similarly described his efforts to "reach out to customers that [Atlas] had had for a long time . . . to understand why they had left Atlas and went with Peak Serum." (Paniccia Testimony, Doc. # 138 at 410.) These mitigation efforts were fruitful; Dr. Phillips credibly reported that Atlas "fully recovered" in 2016 from the market

confusion Kutrubes caused and had "one of the best years it has ever had" in 2017. (Phillips Testimony, Doc. # 138 at 505.)  On the basis of this evidence, the Court rejects Kutrubes's and Peak Serum's affirmative defense of failure to mitigate.

## I.      ATLAS'S ATTORNEYS' FEES

As the Court explained in Sections II(B)(3) and II(C)(3) above, Atlas is entitled to an award of its reasonable attorneys' fees pursuant to its claims for false designation of origin and federal unfair competition and for misappropriation of trade secrets under CUTSA.  It has yet to file a motion for attorneys' fees or to submit documentation in support of such an award.  Within 30 days of the entry of this Order, Atlas shall file with the Court a motion for attorneys' fees.  Kutrubes and Peak Serum may respond within 10 days of the filing of that motion.

## III.      <u>CONCLUSION</u>

Accordingly, it is ORDERED that judgment shall be entered in favor of Atlas Biologicals, Inc. on its claims for federal trademark infringement; Colorado common law trademark and trade name infringement; misappropriation of trade secrets; and breach of fiduciary duty.  The Court denies Atlas's other claims for relief.  It is

FURTHER ORDERED that a final judgment shall be entered against Defendants Thomas James Kutrubes, Peak Serum, Inc., and Peak Serum, LLC in the amount of $2,048,180.50.  It is

FURTHER ORDERED that the preliminary injunction issued by the Court on March 25, 2015, shall be made PERMANENT.  It is

FURTHER ORDERED that Atlas has 30 days from the date of this Order to file a motion for attorneys' fees.  Kutrubes and Peak shall file a response, if any, within 10 days of the filing of Atlas's motion for attorneys' fees.


DATED: September 23, 2019

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge